# Exhibit B

STATE OF SOUTH DAKOTA                                    IN CIRCUIT COURT

COUNTY OF BROWN                                    FIFTH JUDICIAL CIRCUIT

| | |
|---|---|
| JAMES VALLEY COOPERATIVE TELEPHONE COMPANY, a South Dakota cooperative; JAMES VALLEY COMMUNICATIONS, INC., a South Dakota corporation; and NORTHERN VALLEY COMMUNICATIONS, L.L.C., a South Dakota limited liability company, | CIV. 15-_____ |
| Plaintiffs, | |
| v. | **COMPLAINT** |
| SOUTH DAKOTA NETWORK, LLC, a South Dakota limited liability company; MARK SHLANTA; MARK BENTON; ROD BOWAR; JERRY HEIBERGER; DON SNYDERS; DENNIS LAW; RANDY HOUDEK; and BRYAN ROTH, | |
| Defendants. | |

Plaintiffs James Valley Cooperative Telephone Company, James Valley Communications, Inc., and Northern Valley Communications, L.L.C., by their undersigned counsel, bring this Complaint against South Dakota Network, LLC, Mark Shlanta, Mark Benton, Rod Bowar, Jerry Heiberger, Don Snyders, Dennis Law, Randy Houdek, and Bryan Roth, and in support thereof, state as follows:

## INTRODUCTION

1.      This case seeks compensatory damages, punitive damages and injunctive relief arising out of the unlawful conduct of South Dakota Network, LLC ("SDN"), and its CEO and managers, who have unlawfully interfered with and attempted to prevent Northern Valley Communications, L.L.C. from collecting its lawfully-assessed telecommunications charges from AT&T.

2.      Northern Valley Communications, L.L.C. ("NVC") is a local telephone provider that services residences in business in Brown County, South Dakota, including certain high volume conference call providers.  In order for long-distance telephone calls to reach NVC's customers, long-distance carriers, such as AT&T, pay NVC a fee to transport and terminate their telephone calls to their intended destination.  In the telecommunications industry, these charges are referred to as "access charges" and the rates for these charges are contained in tariffs

1

JVCTC et al. v. SDN et al.
Brown County Civ. 15-
Complaint

developed by NVC and filed with the South Dakota Public Utilities Commission ("SDPUC") and the Federal Communications Commission ("FCC").

3.     Defendant SDN is what is referred to in the telecommunications industry as a Centralized Equal Access ("CEA") Provider.  CEA Providers exist by special FCC and state utility commission orders only in a few of the nation's most rural states (including Iowa, Minnesota and South Dakota).  They were created, and granted a near monopoly, to provide what is known as "tandem switching" services in these rural locations, in order to make it more cost effective for long-distance carriers, such as AT&T, and rural local exchange carriers, such as NVC, to exchange traffic.

4.     Defendants Mark Shlanta, Mark Benton, Rod Bowar, Jerry Heiberger, Don Snyders, Dennis Law, Randy Houdek, and Bryan Roth are officers and managers of SDN.

5.     Desperate to win a lucrative new contract with AT&T, SDN, and its officers and managers, conspired to sacrifice Plaintiffs to the giant of the telecommunications market, AT&T.

6.     More specifically, when Plaintiffs refused to voluntarily relinquish NVC's right to charge AT&T the access charges associated with carrying the long-distance calls of AT&T's customers from Sioux Falls to Brown County, SDN and its managers conspired in the fall of 2013 to interfere with the business relationship between NVC and AT&T, and in the process deprive NVC of this significant revenue source by offering to provide its own transport service directly to AT&T on a secret, off-tariff basis – a plan that not only harms Plaintiffs, but also violates the law.

7.     After hatching this scheme, SDN and its managers attempted to gain Plaintiffs' "cooperation" by threatening to disconnect NVC from SDN's network entirely.  But, knowing that disconnection from the network would cause calls to and from NVC's customers to fail and also violate the law, SDN did not stop there.  Rather, it compounded its errors by making it known that, after disrupting the telecommunications service of thousands of businesses and residents in South Dakota, it would falsely accuse NVC of "blocking" this telecommunications traffic through a false complaint with the FCC.

8.     Plaintiffs protected their interests by demanding that SDN and its managers cease their contemplated unlawful conduct, and making it clear that, if SDN proceeded with their ill-conceived plan, Plaintiffs would sue them.

9.     Plaintiffs successfully held SDN and its managers at bay for nearly a year. Ultimately, however, SDN and its managers' greed became too strong to resist and they again returned to their schemes.  That is, SDN and its managers did, in fact, enter into a secret, off-tariff deal with AT&T in the fall of 2014.  SDN, in violation of law, its Operating Agreement, and contracts with Plaintiffs, has agreed to provide non-tariffed transport services to AT&T solely and exclusively for traffic routed to NVC.

10.     Worse still, SDN purportedly provides this transport service to AT&T over transport facilities that are leased and under Plaintiffs' control.  In other words, SDN is charging

2

JVCTC et al. v. SDN et al.
Brown County Civ. 15-
Complaint

AT&T for transport services that are, in fact, provided over the very facilities that NVC controls (and for which SDN continues to collect significant lease payments from the Plaintiffs).

11.    Plaintiffs bring this complaint in order to seek monetary and injunctive relief against SDN's unlawful conduct.

## PARTIES

12.    Plaintiff James Valley Cooperative Telephone Company ("JVCTC") is a telephone cooperative that was formed in 1951 to serve the telephone needs of the people of rural Brown County. The Cooperative has since expanded to include members in Brown, Day, Spink, Marshall, and Clark Counties. JVCTC is a founding member, and at all times relevant hereto has remained a member, of Defendant SDN. JVCTC is the sole shareholder of James Valley Communications, Inc.

13.    Plaintiff James Valley Communications, Inc. ("JVC") is a South Dakota corporation that was formed to provide telecommunications and information services to residents of South Dakota. JVC's principal place of business is in Brown County. JVC is the sole member of Northern Valley Communications, L.L.C.

14.    Plaintiff Northern Valley Communications, L.L.C. ("NVC"), is a South Dakota limited liability company with its principal place of business in Brown County. NVC is a competitive local exchange carrier ("CLEC") that provides competitive telecommunications and information services in certain areas of Brown and Spink Counties not served by JVCTC. NVC is a predominant Internet service provider in northeast South Dakota and provides telecommunications service to thousands of business and residential customers. By virtue of its ownership, NVC is an affiliate member of Defendant SDN.

15.    Defendant South Dakota Network, LLC ("SDN") is a South Dakota limited liability company that provides telecommunication services to its members and their affiliates throughout the state of South Dakota.

16.    Defendant Mark Shlanta is, and at all times relevant hereto has been, the Chief Executive Officer of SDN. Upon information and belief, Mr. Shlanta resides in Lincoln County.

17.    Defendant Mark Benton is, and at all times relevant hereto has been, a manager of SDN. Upon information and belief, Mr. Benton resides in Brule County.

18.    Defendant Rod Bowar is, and at all times relevant hereto has been, a manager of SDN. Upon information and belief, Mr. Bowar resides in Lyman County.

.19.    Defendant Jerry Heiberger is, and at all times relevant hereto has been, a manager of SDN.   Upon information and belief, Mr. Heiberger resides in Deuel County.

20.    Defendant Don Snyders is, and at all times relevant hereto has been, a manager of SDN. He serves as Vice President of the SDN Board of Managers. Upon information and belief, Mr. Snyders resides in Minnehaha County.

JVCTC et al. v. SDN et al.
Brown County Civ. 15-
Complaint

21.     Defendant Dennis Law is, and at all times relevant hereto has been, a manager of SDN.  Upon information and belief, Mr. Law resides in Pennington County.

22.     Defendant Randy Houdek is, and at all times relevant hereto has been, a manager of SDN.  He serves as the Secretary/Treasurer of the SDN Board of Managers.  Upon information and belief, Mr. Houdek resides in Hyde County.

23.     Defendant Bryan Roth is, and at all times relevant hereto has been, a manager of SDN and President of the SDN Board of Managers.  Upon information and belief, Mr. Roth resides in McCook County.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction pursuant to SDCL 16-6-9(2).

25.     Venue is proper in this Court pursuant to SDCL 15-5-6 and/or SDCL 15-5-8 because damages were inflicted on the Plaintiffs in Brown County, South Dakota.

## BACKGROUND – ACCESS CHARGES

26.     Historically, telephone service in the United States was largely provided by a single, integrated company known as AT&T.  In 1984, AT&T was split into "local" and "long distance" companies.  The local telephone companies, known as LECs, maintained exclusive franchises to provide telephone service within defined geographic service territories.  By contrast, the long-distance portion of AT&T was faced with competition from MCI, Sprint, and others.

27.     Long-distance carriers, known in the industry as interexchange carriers or long-distance carriers, generally utilized their own lines to carry calls across a state or across the country.  They did not, however, own the telephone lines within the local exchange.  Rather, those lines were owned by the LECs.  To enable long-distance competition, the FCC required LECs to allow long-distance carriers to use their local lines for purposes of "originating" and "terminating" telephone calls.  For example, when a consumer made a long-distance call, the consumer's LEC would "originate" the call and hand it off to the long-distance carrier.  The long-distance carrier would carry the call across its network and deliver it to another LEC to "terminate" the call to the dialed customer.

28.     To compensate LECs for use of their networks, the FCC required long-distance carriers to pay "access charges" for the LECs' role in "originating" and "terminating" long-distance telephone calls.  These access charges were set forth in regulated price lists, known as tariffs, filed with the FCC and applicable state public service commissions.  If the call originates in one state and terminates in another state, the access charges that applied have consistently been under the FCC's jurisdiction.  If the call originates and terminates in the same state, the access charges that apply largely fall under the state public service commission's jurisdiction (*i.e.*, the South Dakota Public Utilities Commission).

4

JVCTC et al. v. SDN et al.
Brown County Civ. 15-
Complaint

29.     In 1996, Congress overhauled the nation's telecommunications laws with the Telecommunications Act of 1996 ("1996 Act"). As part of the 1996 Act, Congress eliminated the exclusive franchises possessed by the incumbent LECs ("ILECs"). The effect was to compel all states to open their local telecommunications markets to competition from new entrants, known as Competitive Local Exchange Carriers or CLECs.

30.     Congress also required all telecommunications carriers — local and long-distance carriers, alike — to interconnect their networks "directly or indirectly with the facilities and equipment of other telecommunications carriers." 47 U.S.C. § 251(a). Interconnection ensures that all consumers can place calls to and receive calls from all other consumers, regardless of their telecommunications carrier.

## REGULATORY BACKGROUND – SOUTH DAKOTA NETWORK

31.     As noted above, in order to provide their telecommunications services and complete calls to, or accept calls from, residents in South Dakota, long-distance carriers must interconnect their networks with the networks of local telephone companies ("local exchange carriers" or "LECs").

32.     Because it would be cost prohibitive for long-distance carriers to build their own network to each rural LEC in South Dakota, JVCTC and other rural LECs came together to form SDN. In 1991, the South Dakota Public Utilities Commission entered an Order ("SDPUC Order") that granted approval for SDN to construct and tariff a "centralized equal access" ("CEA") service in South Dakota. A similar Order was also issued by the FCC. With SDN's CEA service in place, long-distance carriers send their long-distance traffic to SDN's switching facilities in Sioux Falls, where traffic from various carriers is aggregated and picked up and carried back by the applicable LEC whose customer is receiving the long-distance call. That is, SDN and its members have transport facilities in place that allow the traffic to reach the designated LEC without each long-distance carrier separately constructing their own facilities to each of these rural locations. This hub-and-spoke model therefore saves the long-distance carriers considerable expenses.

33.     Under the SDPUC Order, SDN was granted a monopoly to provide the tandem switching services necessary to route the long-distance traffic of its members in South Dakota. SDN Order, at 11. The Order recognized that it intended to "discourage the threat of bypass, which is detrimental to the SDN member systems." *Id.* at 8, ¶ 48. The SDPUC Order has not been modified or changed to eliminate the monopoly granted to SDN.

34.     At all times since the formation of SDN, in conformance with the SDPUC Order, SDN has maintained as its official policy the position that SDN members and their affiliated companies must interconnect with SDN and allow SDN to provide the tandem switching for the telecommunications traffic that is being originated or terminated in the LEC's exchange. Indeed, this not merely a policy, but is a material term of the SDN Operating Agreement, as amended in May 2013. (Section 15.1.1 of the Operating Agreement)

35.    Like the other members of SDN, JVCTC has consistently utilized the CEA services of SDN to exchange traffic with long-distance carriers. Specifically, all traffic is exchanged at SDN's facilities in Sioux Falls, where SDN provides the service known as "tandem switching" before passing the traffic to JVCTC. JVCTC then transports that traffic to its local exchange for switching and ultimate termination to the called party. In exchange for transporting, switching and terminating the call, JVCTC is entitled by SDPUC and FCC rules to assess a tariffed "access charge" on the long-distance carrier who sent the traffic to JVCTC's customer.

36.    Upon information and belief, other members of SDN operate in a similar manner (*i.e.,* they accept the traffic at SDN's tandem switch in Sioux Falls, and then transport the traffic to their respective exchanges for termination) and also assess their own tariffed access charges for the transport and switching services they provide.

37.    When NVC was created in 1999, it requested and was granted permission by SDN to also utilize SDN's CEA services. Specifically, it requested that "SDN services be provided under the same terms, conditions and prices that apply to James Valley and other SDN owners." NVC's request, which is fully consistent with SDPUC's Order creating SDN and SDN's long-standing policies, was granted at the September 28, 1999, SDN Board Meeting. (See Letter of Eidahl, Former President of NVC, attached hereto as **Exhibit A**.)

38.    Since that time, NVC has consistently been responsible for transporting its access traffic from Sioux Falls, SD, to its exchange for termination in and around Aberdeen and Redfield. NVC has also consistently assessed a tariffed transport charge on long-distance carriers.

39.    In order to provide its transport services, NVC entered into a series of contracts with SDN to lease capacity on the fiber network constructed by SDN. Those contracts were most recently renegotiated in 2007. In negotiating those contracts, NVC relied upon SDN's long-standing policy preventing long-distance carriers from directly interconnecting with members and affiliates for the exchange of access traffic, and NVC's ability to charge and collect its tariffed access charge for transport from Sioux Falls.

## NVC'S ACCESS STIMULATION AND DISPUTES WITH AT&T

40.    Like many other LECs attempting to provide advanced telecommunication services in rural parts of the country, NVC recognized that an increase in traffic volumes on its network would allow it to collect more access revenue and, in turn, provide more and better services to the residents of rural South Dakota. As such, while it continued to serve traditional residential and business customers, it also began to compete for customers that received high volumes of calls, such as free conference calling services.

41.    Over the course of many years, AT&T and other long-distance carriers tried, but failed, to convince the FCC to prohibit LECs like NVC from engaging in "access stimulation" by providing service to free conference calling services or to prevent LECs from assessing tariffed access charges on these calls. *See Connect America Fund*, ¶ 672, 674. Rather, on November 18,

2011, the FCC struck a compromise when it adopted *Connect America Fund Order* that specifically permitted LECs to engage in "access stimulation." The *Connect America Fund Order* required LECs that engage in "access stimulation" to reduce their rates to match the largest "price cap" ILEC[1] in the state. NVC complied with the *Connect America Fund Order* when it filed its new tariff effective January 21, 2012.

42.    The Commission also required intrastate rates to be phased down to the same levels as the interstate access rates, preempting the state commission's continued ability to set those intrastate access charges. *See, e.g., id.*, ¶¶ 35, 801. Specifically, the Commission required LECs to reduce their intrastate access rates to be equal to the interstate access rates. *Id.*, ¶¶ 688-91. NVC also complied with this portion of the *Connect America Fund Order* when it filed its revised tariff with the SDPUC on June 26, 2013, which became effective July 2, 2013.

43.    NVC's tariffed interstate access rates are fully consistent with the requirements of the *Connect America Fund Order*. NVC has also reduced its intrastate access rates to mirror its interstate rates as required by the *Connect America Fund Order*.

44.    Even though AT&T has been billed for and received services pursuant to NVC's 2012 federal and state tariffs, since March of 2013, AT&T has refused to pay NVC for much of the access services NVC provides to AT&T.

**SDN'S, AND ITS OFFICERS' AND MANAGERS',
INITIAL THREATS TO BREACH OBLIGATIONS TO PLAINTIFFS**

45.    Despite tariffing rates that fully comply with the *Connect America Fund Order*, as noted above, AT&T began withholding payment from NVC in order to try to obtain even lower rates. AT&T began demanding that NVC either bypass SDN and interconnect directly with it, or transport its traffic from Sioux Falls at rates below those in NVC's federal tariff.

46.    Based on the SDPUC Order, the terms of the SDN Operating Agreement, and SDN's long-standing policy against direct connection, NVC refused AT&T's request to directly connect.

47.    NVC's refusal to direct connect has been fully supported by SDN's management in the past, which specifically amended the SDN Operating Agreement in May 2013 to make it harder for NVC to take its traffic off of the SDN network by expressly stating that a member (such as JVCTC) must send the access traffic of its affiliate (such as NVC) to SDN. Indeed, over the years, SDN has profited handsomely in the form of tariffed access charges for switching, that

---

[1]    A "price cap" ILEC refers to a category of incumbent carrier whose rates are carefully monitored by the Commission with the aim of ensuring the carrier is operating in a highly efficient manner. Price cap ILEC's generally have high volumes of traffic and the lowest access charges in a particular state. In South Dakota, CenturyLink (formerly Qwest Communications) is the "price cap" ILEC and Northern Valley's 2012 tariff matched CenturyLink's rates in South Dakota.

7

JVCTC et al. v. SDN et al.
Brown County Civ. 15-
Complaint

are assessed by SDN on long-distance carriers, by having the NVC's high traffic volumes pass
through its network.

48.     SDN, however, suddenly flip-flopped.  In early November 2013, Defendant
Shlanta began demanding that NVC agree to direct connect with AT&T, or to otherwise
significantly reduce the transport charges NVC assessed on AT&T.

49.     Shlanta admitted to NVC that the reason for this sudden change was because SDN
sought to obtain other business from AT&T, namely a contract to provide backhaul services
from AT&T to transport telecommunications traffic from various AT&T cell phone towers in
South Dakota and surrounding states.  Shlanta represented that AT&T threatened to not move
forward with that contract unless and until SDN forced NVC to agree to AT&T's demands
regarding the direct connect or rate reductions.

50.     Defendant Shlanta not only demanded that NVC give in to AT&T's demands,
which are not based on existing law, but made it clear that he would take whatever actions were
necessary to get AT&T what it wanted.

51.     On November 22, 2013, Defendants Benton, Bowar, Heiberger, Snyders, Law,
Houdek, and Roth (collectively, the "SDN Managers"), together with Defendant Shlanta,
convened a meeting of the SDN Board of Managers.  Plaintiffs' CEO, James Groft, despite being
a duly-elected manager of SDN, was specifically asked not to attend the meeting.

52.     Without giving Plaintiffs any prior opportunity to address the Managers or
provide NVC's perspective on the dispute, the SDN Managers and Defendant Shlanta conspired
to breach the SDN Operating Agreement, NVC's contracts for telecommunications circuits with
SDN, and to interfere with NVC's ability to collect its tariffed access charges from AT&T for
transport services.

53.     Specifically, as confirmed by a letter dated November 25, 2013 (**Exhibit B**), the
SDN Managers voted to allow AT&T to receive direct trunk transport directly from SDN, rather
than continuing to receive, and pay tariffed rates for, transport services from NVC.

54.     The SDN Managers agreed that if NVC would not agree to its scheme, thereby
relinquishing its rights under the express terms of the Operating Agreement, its access services
tariffs, and its contracts with SDN, SDN would terminate NVC's circuits and use SDN's
termination of those circuits as a basis to falsely accuse NVC of "blocking AT&T terminating
access traffic. . . ."  (**Exhibit B**)

55.     The unequivocal statement of intent to breach the Operating Agreement and
existing circuit contracts if Plaintiffs did not relinquish existing rights, was a breach of those
contracts and applicable law, and such actions were taken in bad faith and inconsistent with the
duty of good faith and fair dealing that applies to all LLC managers in South Dakota.  The action
was taken in order to create profit for the other members at the Plaintiffs' expense.

JVCTC et al. v. SDN et al.
Brown County Civ. 15-
Complaint

## SDN AND ITS OFFICERS AND MANAGERS
## PERSIST IN THEIR WRONGFUL CONDUCT

56.     After receiving the November 25, 2013, letter, Plaintiffs informed SDN and its managers that Plaintiffs intended to sue SDN, Shlanta, and the SDN Managers, and seek equitable and injunctive relief to prevent their unlawful conduct. After being so notified, SDN and its managers rescinded their letter and represented to Plaintiffs that they would not take the threatened actions or otherwise interfere with NVC's rights.

57.     Despite these representations, SDN, Shlanta, and its managers only refrained from their scheme for a short period of time. When further discussions with AT&T did not yield immediate results to SDN's liking, Shlanta and the managers resumed actions that were intended to provide transport services to AT&T, to the detriment of NVC.

58.     On March 5, 2014, SDN filed with the FCC a proposed amendment to its federal tariff. (*See* **Exhibit C**.) That amendment would have added a new service to SDN's tariff. It was titled "Terminating Direct Trunk Transport." It would have allowed long-distance carriers like AT&T to request that SDN provide direct trunks for traffic to a carrier "engaged in Access Stimulation." SDN did not advise NVC of its intent to file the amendment, nor did it seek NVC's consent prior to filing the revision, even though NVC is the only SDN member or affiliate that would have been affected by it.

59.     On or about March 18, 2014, members of the Wireline Competition Bureau, at the FCC, called SDN and asked that SDN withdraw the proposed amendment. Upon information and belief, the FCC staff believed the tariff amendment was discriminatory and improper, and impermissibly did not contain any prices for this new Terminating Direct Trunk Transport service. The FCC also believed that the proposed new service was in conflict with the FCC Order granting SDN authority to provide CEA services in South Dakota.

60.     Since its aborted effort to amend its tariff in March 2014, SDN has not filed a new or revised tariff permitting it to provide Terminating Direct Trunk Transport or its equivalent.

61.     Nevertheless, in mid-October 2014, NVC learned, for the first time, that SDN may have entered into an agreement with AT&T. Whether an agreement had been reached between SDN and AT&T that had any connection to transport services, and the extent to which that agreement would impact NVC, was not clear.

62.     On November 12, 2014, AT&T sent NVC a notice of dispute. That notice provided, *inter alia*,

> On September 14, 2014, AT&T entered into a Service Agreement with South Dakota Network, LLC ("SDN"), for the purchase of Switched Access Transport – Terminating Service. Pursuant to that Agreement, AT&T has obtained "High Volume Switching and Transport Service" ("HVSTS") to transport switched access traffic from AT&T's Point of Presence through SDN's network for handoff to Northern Valley in Groton, S.D. As a result of this agreement, AT&T rejects any duplicate

9

JVCTC et al. v. SDN et al.
Brown County Civ. 15-
Complaint

billing for the same service included in billing statements issued by Northern Valley.

63.     Upon receiving this dispute notice, NVC contacted both SDN and AT&T in an effort to obtain the "Service Agreement" discussed in AT&T's letter. Neither SDN nor AT&T would provide NVC with a copy of the agreement between SDN and AT&T. Rather, NVC was only able to obtain a copy of the agreement after it served a subpoena on SDN in connection with its case against AT&T.

64.     Upon information and belief, the AT&T/SDN Service Agreement was negotiated with AT&T by Defendant Shlanta.

65.     Upon information and belief, Defendants Benton, Bowar, Heiberger, Snyders, Law, Houdek and Roth, individually and collectively, participated in approving or ratifying the AT&T/SDN Service Agreement, and did so with full knowledge of the negative effects it would have on NVC, and despite their fiduciary duties to Plaintiffs.

66.     On information and belief, under the AT&T/SDN Service Agreement, SDN provides to AT&T the same service that the FCC refused to permit SDN to amend its tariff to include because the proposed service was discriminatory and not cost-based.

67.     Also upon information and belief, NVC is the only SDN member or affiliate that was targeted for special adverse treatment by the secret, off-tariff agreement between AT&T and SDN.

68.     On information and belief, when AT&T obtains its off-tariff service from SDN under the AT&T/SDN Agreement, SDN uses the same facilities that NVC leases from SDN to carry its long-distance traffic between SDN's switch in Sioux Falls and NVC's switch in Groton.

69.     Further, on information and belief, SDN and AT&T intended for their Agreement to be secret and not publicly available.

70.     Upon information and belief, SDN has not filed the AT&T/SDN Service Agreement with any regulatory authority, including, but not limited to, the FCC or the SDPUC.

71.     Upon information and belief, SDN never intended for any of the following to occur: (1) the terms of its relationship with AT&T to be made public; (2) to have the offering be available on non-discriminatory terms to other long-distance carriers; or (3) for the agreement to affect any SDN members or affiliate LECs other than NVC.

72.     Defendants Mark Benton, Rod Bowar, Jerry Heiberger, Don Snyders, Dennis Law, Randy Houdek, and Bryan Roth are each managers of other South Dakota telecommunications carriers that are members of SDN and that connect to SDN's network. On information and belief, the AT&T/SDN Service Agreement does not permit AT&T to request or demand dedicated facilities be established between SDN's tandem switch located in Sioux Falls, South Dakota, and the local switches of the SDN member companies that Defendants Benton, Bowar, Heiberger, Snyders, Law, Houdek, and Roth are managers of, nor do any of these SDN

10

JVCTC et al. v. SDN et al.
Brown County Civ. 15-
Complaint

member companies provide direct trunking to AT&T to their local switches.  Defendants
Shlanta, Benton, Bowar, Heiberger, Snyders, Law, Houdek, and Roth singled out NVC for this
disparate treatment for their own unlawful gain.

## COUNT I
### (SDN and SDN Managers – Breach of Operating Agreement)

73.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1
through 72 of this Complaint as if fully set forth herein.

74.     The SDN Operating Agreement requires members and affiliates to have all access
traffic flow through SDN, and provides members and affiliates with the right to designate a point
of interconnection with SDN.

75.     As other SDN members have consistently done, Plaintiffs have designated Sioux
Falls as their point of interconnection with SDN.  The Operating Agreement does not give SDN
a unilateral right to change this point of interconnection.  Nor would existing law allow such a
change by any party.

76.     SDN and its Managers entered into the AT&T/SDN Service Agreement, and
agreed to provide AT&T with services directly to NVC's local switch, which breaches the SDN
Operating Agreement.

77.     SDN's provision of services through the AT&T/SDN Service Agreement causes
harm to Plaintiffs.

## COUNT II
### (SDN – Breach of Contracts)

78.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1
through 77 of this Complaint as if fully set forth herein.

79.     NVC entered into a contract with SDN whereby SDN agreed to provide NVC
with services "under the same terms, conditions and prices that apply to James Valley and other
SDN owners."

80.     Consistent with that contract, NVC entered into a contract with SDN whereby
SDN agreed to provide high capacity transport circuits to NVC, so that NVC may, in turn,
transport access traffic from Sioux Falls to its exchanges in Brown County and Spink County.
An implied term in that contract was that SDN would not interfere with NVC's ability to collect
tariffed transport charges from long-distance carriers for transporting said access traffic from
Sioux Falls to Brown County.

81.     SDN breached these contracts by agreeing to provide direct trunk transport to
AT&T.

11

JVCTC et al. v. SDN et al.
Brown County Civ. 15-
Complaint

82.     Plaintiffs are damaged by SDN's breach of the contracts, because Plaintiffs continue to pay SDN for the lease of the same capacity that SDN purports to use to provide transport services to AT&T, and because SDN's actions embolden AT&T to continue to refuse to pay NVC for the transport services provided by NVC.  The amount of these damages will be proven at trial.

COUNT III
(Shlanta and SDN Managers – Breach of Duty of Good Faith and Fair Dealing)

83.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 82 of this Complaint as if fully set forth herein.

84.     South Dakota law expressly imposes upon managers of a manager-managed limited liability company a duty of good faith and fair dealing towards other members of the limited liability company.  SDCL § 47-34A-409(d) & (h).

85.     Officers of an LLC, such as Shlanta, exercise significant control over the affairs and decisions of the LLC.  As such, Shlanta also owes the members of SDN a duty of good faith and fair dealing.

86.     The SDN Managers and Shlanta have violated this duty to Plaintiffs by, *inter alia*, (a) attempting to force NVC to relinquish its existing rights to collect tariffed access charges; (b) threatening to disconnect NVC's circuits without cause; (c) attempting to extort the relinquishment of these rights by threatening to artificially disrupt the flow of telecommunications traffic in the state of South Dakota; (d) interfering with NVC's existing business relationship with AT&T; (e) denying Plaintiffs the ability to use the SDN network in the manner in which it always has; and (f) denying Plaintiffs the ability to use the SDN network in the manner that is consistent with applicable law and how other members and affiliates use the network.

87.     This breach of good faith and fair dealing materially harms Plaintiffs and, in particular, NVC's business.

COUNT IV
(SDN – Intentional Interference with Business Relationship)

88.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 87 of this Complaint as if fully set forth herein.

89.     Plaintiffs had a valid existing business relationship and an expectancy of future business with AT&T pursuant to NVC's tariffs.

90.     SDN knew about the existence of this relationship and business expectancy.

91.     SDN purposefully and unjustifiably interfered with this contractual relationship that has damaged NVC in an amount to be determined at trial.

12

JVCTC et al. v. SDN et al.
Brown County Civ. 15-
Complaint

92.     SDN interfered with NVC's relationship with AT&T for an improper purpose, namely to benefit SDN's other members by gaining new contracts with AT&T and diverting access revenues otherwise due to NVC to SDN's other members.

93.     As a result of the interference with Plaintiffs' business relationships, Plaintiffs suffered and will continue to suffer substantial and irreparable harm, because it interferes with NVC's ability to collect for its transport services.  NVC is entitled to damages in a yet undetermined amount, together with equitable relief.

## COUNT V
## (SDN – Violation of South Dakota Trade Regulation SDCL 37-1-4)

94.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 93 of this Complaint as if fully set forth herein.

95.     SDCL 37-1-4 makes it unlawful for any person to attempt to destroy competition from the "regular established dealer" of a commodity by discriminating against different "sections, communities, or first and second class municipalities" of the State of South Dakota by selling the commodity in one location at a lower rate than in other parts of the state.

96.     SDN has engaged in unfair discrimination by attempting to displace NVC as the regular established dealer of transport services from Sioux Falls to Groton by offering AT&T – and only AT&T – a lower rate for transporting calls to the part of the state served by NVC, as compared to any other parts of the state.

97.     SDN's efforts to restrain trade damages Plaintiffs.

98.     SDN is not protected from liability by SDCL 37-1-3.5 for its efforts to restrain trade, because it decided to engage in a secret, off-tariff agreement and, thus, is not providing telecommunications services "pursuant to tariffs or schedules" approved by any regulatory agency.  Again, to the contrary, SDN's efforts to tariff such a service were rejected.

## COUNT VI
## (SDN – Unjust Enrichment)

99.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 98 of this Complaint as if fully set forth herein.

100.    SDN is purporting to provide a transport service to AT&T, under the AT&T/SDN Service Agreement, that it is not lawfully permitted to provide.

101.    SDN is also utilizing transport capacity that is already leased to NVC, in order to provide services to AT&T under the AT&T/SDN Service Agreement.

102.    SDN is collecting revenues from AT&T, under that AT&T/SDN Service Agreement, that should be paid to NVC, the entity that actually provides the transport services.

JVCTC et al. v. SDN et al.
Brown County Civ. 15-
Complaint

103.   It would be wrongful and unjust to allow SDN to retain the funds it receives from AT&T for transport services pursuant to the AT&T/SDN Service Agreement.

104.   The funds obtained by SDN rightfully and equitably belong to NVC.

## COUNT VII
### (Declaratory Judgment – SDN, Shlanta, and SDN Managers)

105.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 104 of this Complaint as if fully set forth herein.

106.   A present, actionable and justifiable controversy exists with respect to the legal rights between the parties.  Such controversy arises under the laws of South Dakota.  Plaintiffs cannot obtain relief other than through litigation.

107.   SDN is violating its tariffs and its contracts with Plaintiffs, and Shlanta and the SDN Managers breached their duty of good and fair dealing to Plaintiffs.

108.   Absent a declaratory judgment, SDN will continue its wrongful practices of providing secret, off-tariff services to AT&T.

109.   It would be unduly burdensome and inefficient for Plaintiffs to bring new actions for damages each time SDN wrongfully provides such services to AT&T.

110.   Accordingly, Plaintiffs are entitled to a declaratory judgment, and such further relief based upon that declaratory judgment as the Court deems proper, determining that:

    (a)   SDN, Shlanta, and each of the SDN Managers individually, breached their duty of good faith and fair dealing to Plaintiffs;

    (b)   SDN and each of the SDN Managers breached the Operating Agreement;

    (c)   SDN breached its contracts with Plaintiffs; and

    (d)   SDN has no authority to provide AT&T or any other long-distance carrier transport services from Sioux Falls to NVC's switch in Groton, SD.

14

JVCTC et al. v. SDN et al.
Brown County Civ. 15-
Complaint

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief with regard to SDN, Shlanta, and the SDN Managers:

1)      A permanent injunction preventing Defendants from taking any further action to interfere with NVC's ability to provide and collect tariffed access charges for transporting AT&T's traffic from Sioux Falls to Brown County, including, but not limited to, preventing Defendants from providing direct trunk transport services to AT&T;

2)      Specific performance of the Operating Agreement's provision allowing NVC to designate Sioux Falls as its Point of Interconnection with SDN;

3)      Specific performance of the Agreement requiring SDN to provide service to NVC "under the same terms, conditions and prices that apply to James Valley and other SDN owners;"

4)      Specific performance of the contract between SDN and NVC requiring SDN to provide high capacity transport circuits to NVC so that NVC may, in turn, transport access traffic from Sioux Falls to its exchange in Brown County;

5)      Compensatory damages against SDN, Shlanta, and each of the SDN Managers;

6)      Punitive damages, in accordance with SDCL § 21-3-2, or any other applicable provision of law, against SDN, Shlanta, and each of the SDN Managers;

7)      Prejudgment and post-judgment interest as allowed by law;

8)      For Plaintiffs' reasonable attorneys' fees and the costs of this action; and

9)      Such other costs and fees as are allowed by law and which the Court deems to be just and proper.

JVCTC et al. v. SDN et al.
Brown County Civ. 15-
Complaint

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.


Dated this 25th day of March, 2015.


BANTZ, GOSCH & CREMER, L.L.C.

James M. Cremer
305 Sixth Avenue SE; P.O. Box 970
Aberdeen, SD  57402-0970
605-225-2232
605-225-2497 (fax)
jcremer@bantzlaw.com

G. David Carter (*pro hac vice forthcoming*)
Joseph P. Bowser (*pro hac vice forthcoming*)
INNOVISTA LAW PLLC
1200 18th Street NW, Suite 700
Washington, DC  20036
202-750-3502
202-750-3503 (fax)
david.carter@innovistalaw.com
joseph.bowser@innovistalaw.com

*Attorneys for Plaintiffs*

16

September 8, 1999

Richard Scott, CEO
South Dakota Network, Inc.
2900 W. 10th St.
Sioux Falls, SD 57104

RE:   NVC's REQUEST FOR SDN SERVICES TO SUPPORT ITS CLEC
      OPERATIONS IN THE ABERDEEN USWC EXCHANGE

Dear Rich:

Northern Valley Communications (NVC) is close to turning up its telecommunications
network in the Aberdeen USWC's exchange.  NVC currently has dial tone and is testing
its network services.  We anticipate that NVC will be ready to provide a full line of
services in early October.  NVC will be remotely switching its Aberdeen traffic via James
Valley's EWSD switch in Groton.  Clint Hanson, Russ Claussen, Tony Madsen and
myself have all had various conversations with you and your staff over the last year as
NVC prepared to provide dial tone, long distance, LNP and other advanced services to
our customers in Aberdeen.

Last week we conferenced with Chuck Fejfar and I agreed I would review the various
services NVC needs from SDN with you and make a written request, which is the
substance of this letter.  First, thank you and your staff for your valuable input into our
CLEC project.  We have sought the advice of SDN's staff at several points during our
planning.  By this letter NVC requests the following SDN services:

1.  <u>LNP</u>   That SDN provide NVC with tandem switching capabilities to reach Illuminet
    and the NPAC database to provide LNP services in the Aberdeen exchange.

2.  <u>SS7</u>   NVC previously received a letter of authority from SDN to allow NVC to use
    SDN's SS7 network.

3.  <u>Intrastate and Interstate Equal Access</u>   Like all other LECs in South Dakota, NVC
    intends to provide Intrastate and Interstate equal access to its customers.
    Therefore, NVC requests this CEA capability from SDN.  SDN is uniquely suited to
    provide this service.  Like other ILECs in the state, we believe our customers would
    be best served by SDN's equal access capabilities and having the ability to access
    IXCs interested in providing long distance in Aberdeen at SDN's Sioux Falls tandem.

4.  <u>Operator Services</u>  NVC requests to use SDN's operator services vendor for all NVC
    provided operator services.

**Exhibit A - Page 1 of 2**

5. <u>911 Services</u>  NVC requests that SDN route our 911 trunks consistent with the same methods that James Valley's trunks are routed today.

To the extent possible, NVC requests that the above SDN services be provided under the same terms, conditions and prices that apply to James Valley and other SDN owners, unless our CLEC status requires a different treatment.  Please provide a written quote for the prices you would charge for the above services.  Also, NVC is willing to sign a written contract with a reasonable term commitment.  With our plan to launch services in early October and the time needed to set up these services, we would appreciate a response to our request as soon as possible.

If you have any questions please contact me.  Larry Hettinger and Don Lee have been working with NVC on our long distance options and tariff issues.  Thanks in advance for your consideration of the above request and we look forward to working with SDN.

Sincerely,


Doug Eidahl
CEO

Cc:     Chuck Fejfar
        Mark Shlanta
        Clint Hanson
        Dennis Hagny
        Larry Hettinger
        Don Lee

**Exhibit A - Page 2 of 2**

Filed: 3/25/2015 12:57:00 PM CST   Brown County, South Dakota    06CIV15-000134

# SDN COMMUNICATIONS

November 25, 2013

**VIA ELECTRONIC MAIL**

James Groft
General Manager
Northern Valley Communications, LLC
235 East 1st Avenue
Groton, SD 57445

Subject: ATT Dispute with South Dakota Network and Northern Valley Communications

Dear Mr. Groft:

　　As we discussed at the recent SDN board meeting, the board discussed the dispute between Northern Valley Communications, LLC ("NV"), South Dakota Network, LCC ("SDN") and ATT regarding the transport and termination of access traffic destined for high volume entities that exist in NV's service territory where ATT uses the SDN access tandem to reach NV's transport and local switching facilities. From SDN's perspective the negotiations to resolve this matter are at an impasse because NV is not willing to supply Direct Truck Transport (DTT) or significantly reduce its price to ATT for transport between SDN and NV. The impasse is imperiling the business and financial interests among ATT, SDN and the members of SDN.

　　Based on that status, the SDN Board has asked that SDN prepare a proposal to ATT for SDN to provide by contract the tandem switching and the direct trunk transport for traffic terminating to NV that ATT has identified as being stimulated and which appears to meet the criteria for stimulated traffic as defined in 47 CFR 63.1. If ATT agrees to the proposal, SDN will bring the proposal to NV for its review and to determine whether NV will agree to accept the proposal negotiated between SDN and ATT for traffic delivery. NV can agree to the transport pricing and provide the transport using transport network supplied by SDN. If NV rejects the proposal and/or refuses to terminate the traffic, SDN is authorized by its board to take whatever legal or other action it deems necessary to require NV to terminate the traffic. This could include the termination of circuit agreements between SDN and NV that NV uses to transport stimulated access traffic and a complaint to the FCC alleging an unreasonable practice because NV is blocking ATT terminating access traffic delivered to NV by SDN.

　　This letter is provided at your request to share the SDN board's position in this matter with the NV board at a meeting of that board on Monday, November 25, 2013.

Sincerely,

Bryan Roth
President
SDN Board of Managers

**Exhibit B - Page 1 of 1**

Filed: 3/25/2015 12:57:00 PM CST   Brown County, South Dakota   06CIV15-000134



CONSORTIA
CONSULTING
Here for you.

This filing is made pursuant to
Section 204(a)(3) of the Communications Act
and becomes effective in 15 days.

March 5, 2014

Ms. Marlene H. Dortch, Secretary
Federal Communications Commission
445 12th Street, S.W.
Washington, D.C. 20554

Re:   South Dakota Network, LLC
      Centralized Equal Access Service
      Revised Access Tariff Filing
      FRN 0005-0974-07

Dear Ms. Dortch:

The accompanying tariff material issued by South Dakota Network, LLC ("SDN"), and bearing FCC No. 1, effective March 20, 2014, is sent to you electronically for filing in compliance with the requirements of the Communications Act of 1934, as amended.

The revised tariff allows for direct trunk transport for a customer terminating high volumes of access minutes to a Routing Exchange Carrier or other entity engaged in Access Stimulation, as defined by the FCC. The tariff filing consists of the revised tariff language and check sheets. In compliance with Section 61.14 of the Commission's Rules, the transmittal, FCC Form 159 and the statutory processing fee are being sent via the Commission's Electronic Tariff Filing System.

All correspondence and inquiries, including petitions against the filing, should be directed to Marlene Bennett at: Consortia Consulting, 2100 Highland Way, Suite V, Mitchell, South Dakota 57301, Phone 605.990.2918, Fax 866.372.5733, email mbennett@consortiaconsulting.com.

Sincerely,

/s/ Marlene Bennett

Marlene Bennett
Consultant for South Dakota Network, LLC

Attachments

**South Dakota Network, LLC**

TARIFF F.C.C. NO. 1
Seventh Revised Page 1
Cancels Sixth Revised Page 1

## CENTRALIZED EQUAL ACCESS SERVICE

### CHECK SHEET

Title Page 1 and Pages 1 to 166, inclusive, of this tariff are effective as of the date shown.  Revised pages as set forth below contain all changes from the original tariff which are in effect on the date hereof.

| Page | Revision # | Page | Revision # | Page | Revision # |
|---|---|---|---|---|---|
| Title | Original | 33 | Original | 67 | 2nd * |
| 1 | 7th* | 34 | Original | 67.1 | Original * |
| 1.1 | 2nd* | 35 | Original | 68 | Original |
| 2 | Original | 36 | Original | 69 | Original |
| 3 | Original | 37 | Original | 70 | 1st |
| 4 | 1st | 38 | Original | 71 | 1st |
| 5 | Original | 39 | Original | 72 | Original |
| 6 | Original | 40 | Original | 73 | Original |
| 7 | Original | 41 | Original | 74 | Original |
| 8 | Original | 42 | Original | 75 | Original |
| 9 | Original | 43 | Original | 76 | Original |
| 10 | 1st | 44 | Original | 77 | 1st |
| 11 | Original | 45 | Original | 78 | 1st |
| 12 | Original | 46 | Original | 79 | Original |
| 13 | Original | 47 | Original | 80 | 1st |
| 14 | Original | 48 | Original | 81 | 1st |
| 15 | Original | 49 | 1st | 82 | Original |
| 16 | Original | 50 | 1st | 83 | Original |
| 17 | Original | 51 | 1st | 84 | Original |
| 18 | Original | 52 | Original | 85 | 1st |
| 19 | Original | 53 | Original | 86 | Original |
| 20 | Original | 54 | Original | 87 | 1st |
| 21 | Original | 55 | Original | 88 | Original |
| 22 | Original | 56 | Original | 89 | 1st |
| 23 | Original | 57 | Original | 90 | 1st |
| 24 | Original | 58 | Original | 91 | 1st |
| 25 | Original | 59 | Original | 92 | Original |
| 26 | 1st | 60 | Original | 93 | Original |
| 27 | 1st | 61 | 1st | 94 | Original |
| 28 | 1st | 62 | Original | 95 | Original |
| 29 | Original | 63 | Original | 96 | 1st |
| 30 | Original | 64 | Original | 97 | Original |
| 31 | Original | 65 | Original | 98 | Original |
| 32 | Original | 66 | Original | 99 | 1st |

*Indicates New This Issue

---

Issued:  March 5, 2014

Effective:  March 20, 2014

By:   Chief Executive Officer
2900 West 10th Street
Sioux Falls, South Dakota 57104

**Exhibit C - Page 2 of 5**

South Dakota Network, LLC

TARIFF F.C.C. NO. 1
Second Revised Page 1.1
Cancels First Revised Page 1.1

## CENTRALIZED EQUAL ACCESS SERVICE
### CHECK SHEET – Cont'd

Title Page 1 and Pages 1 to 166, inclusive, of this tariff are effective as of the date shown.  Revised pages as set forth below contain all changes from the original tariff which are in effect on the date hereof.

| Page | Revision # | | Page | Revision # | Page | Revision # |
|------|-----------|---|------|-----------|------|-----------|
| 100 | Original | (M) | 134 | 6th | 163 | Original |
| 101 | 1st | | 135 | Original | 164 | Original |
| 102 | Original | | 136 | Original | 165 | Original |
| 103 | 1st | | 137 | 1st | 166 | Original |
| 104 | 1st | | 137.1 | Original | | |
| 105 | 1st | | 137.2 | Original | | |
| 106 | 1st | | 137.3 | Original | | |
| 107 | 1st | | 137.4 | Original | | |
| 108 | 1st | | 137.5 | Original | | |
| 109 | 1st | | 138 | Original | | |
| 110 | 1st | | 139 | Original | | |
| 111 | 1st | | 140 | Original | | |
| 112 | Original | | 141 | Original | | |
| 113 | Original | | 142 | Original | | |
| 114 | 1st | | 143 | 1st | | |
| 115 | Original | | 144 | Original | | |
| 116 | Original | | 145 | 1st | | |
| 117 | Original | | 146 | 1st | | |
| 118 | Original | | 147 | 1st | | |
| 119 | Original | | 148 | Original | | |
| 120 | Original | | 149 | Original | | |
| 121 | 1st | | 150 | Original | | |
| 122 | Original | | 151 | Original | | |
| 123 | Original | | 152 | Original | | |
| 124 | Original | | 153 | Original | | |
| 125 | Original | | 154 | Original | | |
| 126 | Original | | 155 | Original | | |
| 127 | Original | | 156 | Original | | |
| 128 | 1st | | 157 | 1st | | |
| 129 | 1st | | 158 | Original | | |
| 130 | 1st | | 159 | Original | | |
| 131 | 1st | | 160 | Original | | |
| 132 | Original | | 161 | Original | | |
| 133 | Original | | 162 | Original | | |

*Indicates New This Issue

Issued: March 5, 2014

Effective:  March 20, 2014

By:   Chief Executive Officer
2900 West 10th Street
Sioux Falls, South Dakota 57104

**Exhibit C - Page 3 of 5**

**South Dakota Network, LLC**

TARIFF F.C.C. NO. 1
Second Revised Page 67
Cancels First Revised Page 67

### CENTRALIZED EQUAL ACCESS SERVICE

5.   Ordering Options for Switched Access Service

    5.1   General

        (A) This section sets forth the regulations and other related charges for Access Orders for Access Service.  These charges are in addition to other applicable charges as set forth in other sections of this Tariff.

        An Access Order is an order, in a form or format acceptable to SDN and the customer, to provide the customer with Access Service, access related services, or to provide changes to existing services.

        Transport is provided as tandem switched only. Direct-Trunked Transport as defined in Section 2.6 is not available to a Routing Exchange Carrier's end office since equal access is provided through the SDN centralized access tandem (Federal Communications Commission No. DA 90-1964), unless the conditions outlined in 5.1(B) following apply.    (N)
   (N)

        Unless covered under another separate contract or agreement (i.e. transiting traffic service agreement), all traffic delivered by an IC to the SDN access tandem will be considered access traffic and billed accordingly.

        (B) Terminating Direct Trunk Transport may be ordered by a customer terminating high volumes of access minutes to an end office served by a Routing Exchange Carrier or any other entity engaged in Access Stimulation (as defined by the FCC)  if the following conditions are applicable:    (N)

           1.   The Routing Exchange Carrier or any other entity engaged in Access Stimulation has a interstate terminating to originating traffic ratio of at least 3:1 in a calendar month and the minutes are terminating to an end office within a single operating company number (OCN), or

           2.   The Routing Exchange Carrier or any other entity engaged in Access Stimulation has had more than a 100% growth in interstate terminating switched access minutes of use in a month compared to the same month in the preceding year for a single end office within an operating company number (OCN).

        This exception allowing Direct Trunk Transport is only available for an end office within a single OCN for a Routing Exchange Carrier or any other entity engaged in Access Stimulation.  Direct Trunk Transport is not available for an end office within an OCN for a Routing Exchange Carrier not engaged in Access Stimulation.    (N)

Certain material formerly found on this page now appears on Original Page 67.1.

---

Issued:  March 5, 2014                                   Effective:  March 20, 2014

By:   Chief Executive Officer
2900 West 10th Street
Sioux Falls, South Dakota 57104

**South Dakota Network, LLC**                                   TARIFF F.C.C. NO. 1
Original Page 67.1

## CENTRALIZED EQUAL ACCESS SERVICE

5.   Ordering Options for Switched Access Service (Cont'd)

     5.1.1   Ordering Conditions

Access Service may be ordered from SDN.  Switched Access Service is provided in (M)
Feature Group D with Signaling System Number 7 (SS7) arrangements only between
the customer's point of termination at SDN's central access tandem and a Routing
Exchange Carrier's point of interconnection.  Access Service between a customer's
premises and the customer's point of termination at the SDN access tandem is solely
the responsibility of the customer and must be provided by the customer or ordered
from another carrier.  Access Service from the Routing Exchange Carrier's point of
interconnection to an end office must be ordered from a Routing Exchange Carrier
or other Exchange Telephone Company.  SDN will determine the Transport facilities
to be provided between a Routing Exchange Carrier's point of interconnection and
SDN's central access tandem on the basis of the capacity ordered.

The customer shall supply all the necessary information to provide service, (e.g.,
customer name, customer address, customer contact and facility interface, etc.)

Orders for Access Service between SDN's central access tandem and the Routing
Exchange Carrier's point of interconnection shall be in BHMCs.                    (M)

---

Issued:  March 5, 2014                                   Effective:  March 20, 2014

By:   Chief Executive Officer
2900 West 10th Street
Sioux Falls, South Dakota 57104

**Exhibit C - Page 5 of 5**