UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| SOUTH DAKOTA NETWORK, LLC, | Case: 16-CV-4031 |
| Plaintiff, | |
| vs. | **PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| TWIN CITY FIRE INSURANCE CO., | |
| Defendant. | |

COMES NOW South Dakota Network, LLC ("SDN"), by and through its undersigned counsel, and hereby submits its Opposition to Defendants' Motion for Summary Judgment. This Opposition is supported by the Affidavit of Counsel, Response to Defendant's LR 56.1 Statement of Material Facts and SDN's Additional Statement of Material Facts, as well as the Rule 56(d) Affidavit filed contemporaneously herewith.

## INTRODUCTION

Twin City Fire denied SDN's request for insurance coverage on the basis that the lawsuit filed against SDN in March 2015 was ultimately interrelated with and arose from events that first occurred in November 2013, thereby dictating a denial of coverage because SDN did not provide notice to Twin City Fire of that specific claim. The denial of coverage based on interrelated claims provisions is a particularly vexing issue. An insured of many years should not be denied coverage based upon an inadequate and incorrect assessment of the facts. Such denial leaves an insured to not only defend against the claims made against it, and to do so out of its own pocket, but also to pursue legal action against the insurer as a result of the insurer's flawed perception of

the facts.  An insured has a right to expect more from its insurer of a decade.  To that end, SDN will establish that the facts and circumstances of this case dictate that Twin City Fire's review of the claim presented to it April 2015 was superficial and ultimately incorrect.

### FACTUAL BACKGROUND

SDN is a limited liability company with its principal place of business in Sioux Falls. *See* Amended Complaint at ¶ 1.  SDN is comprised of seventeen members, all of which are local exchange carriers ("LECs") in South Dakota.  *Id.* at ¶ 2.  James Valley Cooperative Telephone Company is a member of SDN ("JVCTC").  Northern Valley Communications ("NVC") is an affiliate of JVCTC (collectively referred to as the "James Valley Parties"), but it is not itself a Member of SDN.  *See* Doc. 22-1, Affidavit of Joseph Coppola, Exhibit 2, ¶ 5.

SDN assists its Members through the operation of a tandem switch located in Sioux Falls, South Dakota.  *See* Amended Complaint at ¶ 2.  SDN's operation of the switch provides both LECs and interexchange carriers or long distance companies ("IXCs") an efficient method of interconnecting their respective networks to exchange long distance traffic.  *Id.*  IXCs are major customers of SDN and its Member companies.  *Id.* at ¶ 11.  SDN provides various services to IXCs, such as AT&T, under properly filed and approved tariffs and through commercially appropriate contractual arrangements.  *Id.*

NVC historically engaged and currently engages in a business practice called access stimulation or traffic pumping to leverage its tariffed access services.  *See* SDN's Statement of Additional Material Facts ("SDN's Statement") at ¶ 1.  NVC works with a third-party service such as free conference calling, chat line or other similar entity to set up businesses in NVC's service area, assigns them phone numbers, and the entities then invite the public to call those numbers free of charge.  *Id.*  NVC is located in a rural, normally high-cost service area so its

access rates are higher than in urban areas.[1]  The invitation for free services such as conference calling can significantly increase terminating access traffic, which increases access revenues, which NVC then shares with the "free" service entities as compensation for their services.  The scheme is financed by IXCs and other similarly situated carriers through the payment of access charges.  *See, e.g.*, *Northern Valley Communications, LLC v. F.C.C.*, 717 F.3d 1017, 1018 (D.C. Cir. June 7, 2013); *Free Conferencing Corp. v. T-Mobile US, Inc.*, 2014 WL 7404600 at *1 (C.D. Cal. Dec. 30 2014);  *Sprint Communications Co., L.P. v. Native American Telecom, LLC*, 2012 WL 591674 at *2 (D.S.D. Feb. 22, 2012); *Iowa Network Services, Inc. v. AT&T Corp.*, 2015 WL 5996301 at *1 n.1 (D.N.J. 2015) (stating that "access stimulation" involves routing large volumes of calls to rural areas to obtain higher rural rates for access services").

SDN is not involved in access stimulation.  *See* SDN Statement at ¶ 3.  NVC is the only South Dakota company with any relationship to SDN that is still involved in access stimulation. *Id.* at ¶ 1.  IXCs like AT&T have not only refused to pay NVC's access charges for stimulated traffic, but also SDN's tandem switching charges for stimulated traffic terminating to those entities stimulating the traffic in the James Valley Parties' territory.  *Id.* at ¶¶ 2, 4.  As a result of NVC's ongoing practice, SDN, as the operator of the tandem switch, is caught in the middle between the James Valley Parties and the IXCs.  *Id.* at ¶ 4.

AT&T began disputing NVC's billings and withholding payment in March 2013 and has continued to do so to date.  *Id.* at ¶ 3.  AT&T stopped paying SDN in approximately April 2013. *Id.* at ¶ 4.  SDN and the James Valley Parties immediately began efforts to work together to

---

[1] At the time that the practice of access stimulation began in 2005, Rural Local Exchange Carriers "RLECs") and Competitive Local Exchange Carriers ("CLECs") billed IXCs at their tariffed rates.  In 2011, the FCC, in an effort to curtail the practice, required all RLECs or CLECs participating in the practice to bill at a significantly lower rate. *Connect America Fund; A National Broadband Plan for Our Future; Establishing Just and Reasonable Rates for Local Exchange Carriers; High-Cost Universal Service Support*, 76 Fed. Reg. 73,830 (Nov. 18, 2011) (the "CAF Order").

resolve their respective billing disputes with AT&T.  *Id.* at ¶ 6.  When SDN believed it was at an impasse with the James Valley Parties, and at their request, the SDN board sent a letter to the James Valley Parties outlining what it saw as an appropriate resolution, hoping that the communications would jumpstart a joint resolution.  *Id.* at ¶¶ 7, 8.  However, SDN's November 25, 2013 letter to the James Valley Parties' General Manager James Groft was met with what was labeled a cease and desist letter from the James Valley Parties' counsel.[2]  *Id.* at ¶ 8; Defendant Twin City Fire Insurance Company's LR 56.1 Statement of Material Facts at ¶ 1. Despite the fact that it was a holiday weekend, SDN called for a special meeting of its Board and voted to retract the November 25, 2013 letter.  *Id.* at ¶ 9.  It also reached out to the James Valley Parties and requested a meeting to discuss a joint resolution.  *Id.* at ¶ 10.

On December 6, 2013, representatives from both SDN and the James Valley Parties met in Groton, South Dakota, where they agreed that SDN would provide the transport for all stimulated traffic from Sioux Falls to Groton, that SDN would bill AT&T for that traffic at a negotiated rate, and that SDN would then share equally those revenues with the James Valley Parties.  *Id.* at ¶¶ 10, 11.  The parties not only agreed upon the provisioning of transport from Sioux Falls to Groton, but also the range of rates acceptable to the James Valley Parties for the transport of traffic.  *Id.*  Within a week of receiving the November 27, 2013 letter, the parties had reached a negotiated agreement.  *Id.*  The James Valley Parties stood down from their threats of legal action.  There was no claim or threatened claim to report to SDN's insurer.  *Id.* at ¶ 12.

---

[2] The James Valley Parties' counsel labeled the November 27, 2013 letter as a "cease and desist letter."  Cease and desist letters are typically utilized to stop a purportedly illegal or harmful act.  In this instance, however, the purpose of the November 27, 2013 letter was preemptive; the James Valley Parties wanted SDN to refrain from making a proposal to AT&T.  There was no *act* by SDN.  As such, the characterization of the November 2013 letter as a true "cease and desist" letter is not only misleading, but allows both the James Valley Parties and Twin City Fire to avail themselves of a better version of the facts.

In the ensuing months, SDN worked diligently with the James Valley Parties and AT&T to resolve the parties' historical billing disputes and AT&T's prospective concerns about the handling of stimulated traffic.[3]  *Id.* at ¶ 13.  In spring 2014, the James Valley Parties informed SDN that it thought it would do better resolving its historical differences with AT&T in court. SDN declined the James Valley Parties' invitation to join in a lawsuit.[4]  *Id.* at ¶¶ 14, 15.  SDN instead stated that it would continue negotiations with AT&T to recover SDN's unpaid amounts and provide a prospective framework for working with AT&T.  *Id.* at ¶ 16. The James Valley Parties continued to participate in the prospective settlement discussions with SDN through June and July 2014, including the submission of a joint proposal to AT&T.  *Id.*  The James Valley Parties never informed SDN that they did not intend to participate in the joint prospective resolution with AT&T.  *Id.*

In September 2014, SDN and AT&T reached a settlement whereby AT&T finalized the terms of a private contract, as suggested by FCC staff, to address the prospective solution for the transport costs associated with stimulated traffic.  *Id.* at ¶ 18.  That private contract reflected the terms of SDN's agreement with NVC.  It was never contemplated that NVC would be a signatory to any agreement between SDN and AT&T; instead, SDN and NVC discussed a separate written agreement setting forth the arrangements by which NVC would be paid its share

---

[3] During this same time period, SDN also pursued another avenue for resolution by visiting the Federal Communications Commission ("FCC") to explore potential for revisions to SDN's FCC tariff, including a provision for transporting stimulated traffic consistent with the FCC's CAF Order. The amendment would have addressed stimulated traffic from any source and for any IXC, not just the James Valley Parties and AT&T.  The FCC encouraged SDN to use an off-tariff contract to provide a high volume transport service to ensure fair and reasonable pricing for stimulated traffic. The FCC has made clear it favors negotiated agreements for access services.  *See In the Matter of Technology Transitions, USTelecom Petition for Declaratory Ruling that Incumbent Local Exchange carriers are Non-Dominant in the Provision of Switched Access Services*, RM-11358, FCC 16-90 (July 15, 2016) at ¶ 26.

[4] NVC filed its complaint related to its historical billing dispute with AT&T in federal court in South Dakota in July 2014.  That matter remains pending.  *See generally Northern Valley Communications, LLC v. AT&T Corp.*, Federal District Court, District of South Dakota, Northern Division, 1:14-CV-01018-RAL.

of their completed transport revenue.  *Id.* at ¶ 19.  Both the Settlement Agreement and AT&T-SDN Services Agreement were designated as "confidential."  *Id.* at ¶ 20.  While SDN did not disclose the physical agreements to the James Valley Parties, it did make their General Manager aware that SDN was finalizing the agreements.  *Id.* at ¶ 23.  The James Valley Parties did not ask SDN to refrain from signing any agreement – temporarily or permanently.  *Id.* at ¶ 21.  SDN was wholly unaware at that time that NVC had no intention of honoring its prior agreement regarding the sharing of the transport revenues.  *Id.* In fact, the James Valley Parties' General Manager admitted in his deposition that he never communicated to SDN that NVC had no intention of honoring its prior agreement regarding the sharing of the transport revenues.  *Id.*

Within a matter of hours after the execution of the AT&T-SDN Service Agreement, AT&T communicated to counsel for NVC the terms of its intended agreement with NVC.  *Id.* at ¶ 22.  However, several days later, the James Valley Parties' counsel sent an e-mail to AT&T, unbeknownst to SDN until its disclosure in the underlying litigation, terminating all prior offers and insisting upon full payment of its tariffed charges or the establishment of a direct connection with AT&T.  *Id.* SDN did not receive a copy of this communication.  Instead, SDN proceeded to talk with the James Valley Parties' General Manager about scheduling a meeting between their respective counsel to discuss finalizing the terms of the global resolution with AT&T.  *Id.* at ¶ 23.

It is the execution of the AT&T agreement in September 2014, as well as SDN's subsequent refusal to terminate that Agreement, that prompted the James Valley Parties to file suit against SDN, its CEO Mark Shlanta and seven of SDN's Managers (the "James Valley Parties' Lawsuit") in March 2015.  *Id.* at ¶¶ 24, 25.

In their Lawsuit, the James Valley Parties asserted the following claims against SDN: Breach of SDN's Operating Agreement; Breach of Contracts; Breach of Duty of Good Faith and Fair Dealing; Intentional Interference with Business Relationships; Violation of South Dakota Trade Regulation SDCL § 37-1-4; Unjust Enrichment; and Declaratory Judgment (relating to the parties' respective legal rights and obligations under their tariffs and contracts, as well as the validity of SDN's contractual relationship with AT&T). *Id.* at ¶ 26. As against SDN's Managers and Mark Shlanta, the James Valley Parties asserted the following claims: Breach of Operating Agreement; Breach of Duty of Good Faith and Fair Dealing; and Declaratory Judgment. *Id.*

In response to the Lawsuit, SDN, Shlanta, and the named Managers denied the allegations against them. Since their initial complaint, the James Valley Parties have filed two amended complaints, the first of which added causes of action for conversion and judicial dissolution of SDN, and the second of which added a claim that SDN breached its Operating Agreement by offering cell site backhaul services to AT&T in the James Valley Parties' service territories without stating they would use the James Valley Parties' facilities to provide those services. *Id.* at ¶ 27. The James Valley parties further alleged that SDN, Shlanta, and the Managers breached the Operating Agreement by failing to terminate the agreement once they were told by the James Valley Parties' counsel that it was illegal. SDN, Mark Shlanta, and the named Managers again denied the allegations. *Id.*

The entirety of the James Valley Parties' arguments are predicated on their belief that SDN had no right to change the James Valley Parties' point of interconnection, never mind it was agreed upon, and that the AT&T-SDN Agreement is not only secret, but illegal under FCC rules and legal precedent. These arguments are distinctly different than those giving rise to the November 27, 2013 claimed cease and desist letter. *Id.* at ¶ 28.

7

On April 8, 2015, SDN gave notice of the November 2014 Letter demanding termination of the AT&T-SDN Agreement and March 2015 Lawsuit to Twin City Fire.  *Id.* at ¶ 29.  On July 1, 2015, Twin City Fire denied SDN's claim for coverage and a defense.  *Id.* at ¶ 30.  In its denial letter, Twin City Fire noted that the James Valley Parties' Lawsuit was "based upon the insureds [sic] alleged conduct regarding its agreement with AT&T and such agreement's attendant effect on the Plaintiffs.  Accordingly, the SD Action is deemed a single Claim first made on November 27, 2013, the date the Insured received the 2013 Draft Complaint, as the Claims are based upon, arise from and are related to the same Wrongful Act or Interrelated Wrongful Acts.  Therefore, the Insuring Agreement of the 2013-2014 Policy is implicated."  *Id.*  Believing that Twin City Fire had misapprehended certain facts, and particularly the timing of the execution of the AT&T-SDN Agreement, SDN requested to speak with Twin City Fire to discuss the reasons for denial.  Prior to the first scheduled call on July 15, 2015, SDN prepared and sent to Twin City Fire a document containing additional information for consideration.  *Id.* at ¶ 31.  After the call and on August 11, 2015, Twin City Fire sent correspondence to SDN reaffirming its denial of coverage and a defense.  *Id.* at ¶ 32.  On August 12, 2015, SDN sent a letter to its agent, Unitel Insurance Group, further explaining the incorrect statements in Twin City Fire's second denial letter and reasserting a demand for coverage.  *Id.* at ¶ 33.  In the ensuing months, SDN continued to ask that Twin City Fire reevaluate its denial and went so far as to enter into a nondisclosure agreement ("NDA") so that SDN might provide Twin City Fire with additional confidential materials for consideration.  *Id.* The parties entered into the NDA, but Twin City Fire refused to re-evaluate its denial.  *Id.* On February 23, 2016, Twin City Fire reaffirmed its initial denial for the same reasons originally contained in its July 1, 2015 denial.  *Id.* at ¶ 34.

**ARGUMENT AND ANALYSIS**

Twin City's Statement of Material Facts and supporting Memorandum fails to address the whole of the facts giving rise to the instant claim.  The limited discussion is in all likelihood intentional as it makes for a far simpler argument.  To that end, it is easy to fall into the trap of directly correlating the James Valley Parties' 2015 Lawsuit with the letter their counsel sent to SDN on November 27, 2013.  However, simply because there are limited commonalities on the face of the legal claims threatened in November 27, 2013 to those actually made in the 2015 Lawsuit does not mandate denial of coverage.  To the contrary, there are distinctions, and distinctions of which Twin City Fire was made fully aware on numerous occasions, that are critical to fully understanding the facts and why SDN was required to report only the November 2014 Letter and subsequent Lawsuit.  It is further evident that Twin City Fire conducted only a superficial review of the claim, denied the claim based on a mere technicality, and thereafter steadfastly refused to give further consideration to the critical facts supplied by SDN.

## I.      Legal Standard.

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses."  *City of Spearfish v. Duininck, Inc.*, No. 5:14-CV-05039-KES, 2016 WL 4133517, at *2 (D.S.D. Aug. 3, 2016) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).  A party moving for summary judgment must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Id.* (additional citations omitted).   "The moving party must inform the court of the basis for its motion and also identify the portion of the record that shows there is no genuine issue in dispute."  *Id.* (quoting *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992)).

If the moving party sustains its burden, the burden shifts to the non-moving party to establish "'that a fact . . . is genuinely disputed' either by 'citing to particular parts of materials in the record, or by 'showing that the materials cited do not establish the absence . . . of a genuine dispute." *Id.* (quoting Fed. R. Civ. P. 56(c)).  The non-moving party must demonstrate the "existence of specific facts which create a genuine issue for trial."  *Id.* (quoting *Mosley v. City of Northwoods, Mo.*, 415 F.3d 908, 910 (8th Cir. 2005) (additional citations omitted)).  The facts must be "viewed in the light most favorable to the party opposing the motion."  *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (additional citation omitted)).

The undisputed material facts in this case support a finding of coverage.  However, if this Court has concerns about the events of November 2013 and November 2014 and how those claims are ultimately described in and dealt with in the James Valley Parties' Lawsuit, there are genuine issues of material facts that dictate denial of Twin City Fire's Motion at this time.

## II.     SDN is entitled to coverage under its 2014-2015 D&O Policy from Twin City Fire.

SDN's 2014-2015 D&O Policy provides coverage for the James Valley Parties' Lawsuit.  SDN provided timely notice of the Lawsuit on April 8, 2015.  The claims raised in that lawsuit do not meet the definition of Interrelated Wrongful Acts as defined in SDN's Policy and, therefore, Twin City Fire's denial of coverage was wrong.

### A.     The 2013-2014 SDN D&O Policy is not applicable to this case.

Twin City Fire asserts that it is the 2013-2014 D&O Policy, and not the 2014-2015 Policy, that applies to the facts of this case.  In order to reach that conclusion, however, Twin City Fire must take a number of liberties with both the facts and the policy language in order to both (a) establish that a claim was actually made against SDN in November 2013 and (b) that the

James Valley Parties' lawsuit is interrelated with that November 2013 claim.  Simply stated, this Court need not reach the issue of whether there is any interrelationship between the events because nothing that happened in November 2013 rose to the level of a claim as defined by the applicable policy.

In support of its argument that the James Valley Parties' Lawsuit is related to claims implicating the 2013-2014 Policy, Twin City Fire states "[i]n November 2013, the underlying plaintiffs first warned SDN not to interfere with their rights to collect tariff access charges from AT&T by allowing AT&T direct access."  *See* Defendant's Memorandum at p. 4.  Twin City Fire further states that "JVCTC and NVC sought to prevent SDN from going ahead with its plan to allow local access to AT&T at below-tariff direct transport services because this would harm their ability to collect tariff access charges from AT&T for transporting calls on their telephone lines."  *Id.*  Twin City's statement of the facts tells only part of the story.

AT&T disputed the tariffed access charges of both SDN and NVC beginning in early 2013.  The parties began working together to identify a joint solution almost immediately.  In fall 2013, the parties reached an impasse in their discussions with NVC.  SDN indicated that it intended to proceed with a proposal directly to AT&T that it would thereafter bring back to NVC for its review and consideration.  SDN's Board met on November 22, 2013 and authorized SDN's CEO to negotiate directly with AT&T.  SDN thereafter told NVC's General Manager of its plan to make a proposal directly to AT&T, after which it would bring that proposal back to NVC for its agreement to the same.  The language of the November 25, 2013 letter from the Board was strong.  It was prompted in part by SDN's frustration with the lack of movement on NVC's part in the negotiations with AT&T and in greater part by NVC's General Manager's

request for a written statement of SDN's plans such that he could present that statement to the Board.

NVC responded with a cease and desist letter on November 27, 2013 (the "2013 Letter"), threatening various and generic legal causes of action. However, the James Valley Parties did not complain of an already completed act, but rather a potential proposal, asking for a retraction of the letter and assurances that SDN would take no action. Within days of receipt of the 2013 Letter, SDN's Board met and retracted the Letter. SDN never proceeded with a unilateral proposal to AT&T nor did it enter into any agreement with AT&T to the detriment of NVC. There was no agreement with AT&T in November 2013 whatsoever. Instead, SDN and NVC representatives met in Groton, South Dakota, on December 6, 2013, to discuss a joint resolution. They agreed to just such a resolution: SDN would transport the stimulated traffic from AT&T from Sioux Falls to Groton.[5]  SDN would bill AT&T and SDN would then share that revenue equally with NVC. NVC agreed. The situation was resolved.

Twin City Fire's high-level generalizations and significant omissions of fact do not withstand scrutiny. The 2013 Letter cannot be characterized as a claim within the meaning of the definition of an Entity Claim under the 2013-2014 D&O Policy. Under this earlier Policy, Entity Claim was defined as any:

> (1) Written demand for monetary damages or other civil relief commenced by the receipt of such demand;
>
> (2) Civil proceeding, including an arbitration or other alternative dispute proceeding, commenced by the service of a complaint, filing of a demand for arbitration, or similar pleading; or

---

[5] SDN was formed for the purpose of providing a tandem switch to provide centralized equal access for IXCs, thus enabling them to reach one point of interconnection for all of SDN's Members, as opposed to being required to build facilities to the service territories of each of SDN's members. Historically, SDN's individual Members billed for the transport of traffic from SDN's tandem switch in Sioux Falls to their respective territories. The Members designated SDN's tandem switch in Sioux Falls as their points of interconnection with SDN. In the instance of SDN's agreement with NVC, NVC agreed that SDN would provide and bill the transport from Sioux Falls to Groton, thus moving NVC's point of interconnection.

(3) Criminal proceeding commenced by the return of an indictment, or formal administrative or regulatory proceeding commenced by the filing of a notice of charges, or similar document;

Against an Insured Entity.

*See* Defendant's Statement, Exhibit A-5.

Subparts 2 and 3 of the definition of Entity Claim are easily dismissed as inapplicable. There was no criminal, civil or administrative proceeding of any kind commenced. While there was a draft complaint forwarded after the 2013 Letter, it was not signed, filed, or served upon SDN or any of its Managers. Therefore, Twin City Fire must force the 2013 Letter into the narrow confines of Subpart 1 of the definition.

As an initial matter, it is unclear what the phrase "or other civil relief commenced by the receipt of such demand" means. The word "commenced" is a term of art in the legal world, associated with the commencement of a lawsuit or other legal or administrative proceeding or civil relief. In the instant context, its use seemingly suggests something more formal, particularly when preceded by the phrase "civil relief," than mere receipt of a letter. A request to retract the 2013 Letter does not fall within the ambit of civil relief. While Twin City Fire makes a brief reference to injunctive relief in its argument, the James Valley Parties did not demand injunctive relief.[6] Moreover, there was nothing to enjoin given that SDN had only stated an intention, not taken an action. In fact, it would have been impossible for the James Valley Parties to pursue a civil action or obtain civil relief.

That leaves the receipt of a "monetary demand." The 2013 Letter made no monetary demand nor can it be characterized as such because SDN had taken no action that harmed NVC's

---

[6] In the 2013 Letter, counsel for the James Valley Parties stated: "[W]e are allowing you until Monday, December 2, 2013, at 5:00 CT to retract the letter and provide written assurance that SDN will not enter into negotiations with AT&T regarding transport for AT&T traffic to NVC[.] . . ." *See* Defendant's LR 65.1 Statement of Material Facts at Exh. 1, ¶ 5.

ability to collect its tarrifed access charges.[7]  In its November 25, 2013 letter, SDN indicated that it *intended* to proceed with a proposal directly to AT&T that it would thereafter bring back to NVC for its review and consideration.  It did not state that SDN had already made a proposal to AT&T or that it had entered into any agreement with AT&T.  It was a statement of intention.  Accordingly, the 2013 Letter demanded that SDN retract its letter and refrain from making any proposal to AT&T.[8]  It thereafter listed a parade of horribles as to what could happen if SDN proceeded with its plan.  Noticeably absent from the 2013 Letter is any demand for monetary damages or other civil relief.  Only if SDN had proceeded with a proposal to AT&T and provisioned services to AT&T, would NVC have been able to pursue its threatened course of civil action against SDN and potentially seek monetary damages.  SDN never made a proposal to AT&T as described in its November 25, 2013 letter.  Instead, SDN's proposed action was rescinded and the basis for the 2013 Letter was resolved within a matter of mere days.  The 2013 Letter never ripened into a claim within the meaning of the 2013-2014 Policy and SDN was not required to give notice of the same.[9]

---

[7] As an aside, at no point during or after this time did AT&T begin to pay either NVC or AT&T.  There was no action taken that interfered with any claimed right NVC had to bill AT&T pursuant to its tariff for certain services.  There was no wrongful act.  Moreover, AT&T has asserted and continues to assert in connection with the *NVC v. AT&T* federal court lawsuit that NVC's tariff does not support the billing of the costs for which NVC seeks recovery.  Twin City fire ignores all of these facts.

[8] The 2013 Letter stated:  "If we receive a retraction and written assurance [by December 2, 2013 at 5:00 CT], we will continue our good faith efforts to get resolution of this matter with AT&T.  If such a retraction and sufficient assurance are not obtained by that time, however, my clients are fully prepared to bring legal action against SDN, Mr. Shlanta, you, and each of the other managers and to vigorously defend its rights."  *See* Plaintiff's Statement at ¶ 1.

[9] On pages 8-9 of its Memorandum, Twin City Fire provides a string cite in support of the proposition that "claims that arise out of common facts . . . constitute a single claim made at the time the insured received notice of the first claim."  However, in each of these cases, there is no question but that there were *two actual claims made*, which claims were based upon the same facts.  In fact, in a majority of the cases, there were two separate lawsuits, thus unequivocally establishing multiple different, but related claims within the meaning of the insurance policies at issue.  *See, e.g., Kircher v. Continental Cas. Co.*, 747 F.3d 983 (8th Cir. 2014) (analyzing two lawsuits brought against the same life insurance agent/broker dealer who was engaged in a similar, if not identical, course of unlawful or inappropriate conduct with his investors); *Highwood Properties, Inc. v. Executive Risk Indem., Inc.*, 407 F.3d 917, 924-25 (8th Cir. 2005) (analyzing two different lawsuits and whether the legal claims therein were related); *TIG*

**B.      The 2014-2015 D&O Policy is applicable in this matter.**

SDN is entitled to coverage and a defense under the terms of the 2014-2015 D&O Policy. This is because the only ripe claim in this matter arose on November 17, 2014 upon issuance of a different cease and desist letter from the James Valley Parties' counsel (the "November 2014 Letter").  Unlike the 2013 Letter that requested a retraction of a stated intention, the November 2014 letter requested that SDN immediately terminate the then-executed AT&T-SDN Agreement because that Agreement had allegedly interfered with NVC's ability to bill AT&T.

Section II, Subsection (D) of the 2014-2015 D&O Policies, defines an "entity claim" as follows:

(D) Entity Claim means any:

(1)      written demand for monetary damages or other civil non-monetary relief commenced by the receipt of such demand;

(2)      civil proceeding, including an arbitration or other alternative dispute proceeding, commenced by the service of a complaint, filing of a demand for arbitration, or similar pleading; or

(3)      criminal proceeding commenced by the return of an indictment, or formal administrative or regulatory proceeding commenced by the filing of a notice of charges, or similar document;

against an Insured Entity.

*See* Exhibit A-6; Amended Complaint at Exhibit A.  The November 2014 Letter sent by counsel for the James Valley Parties falls within the definition of an "Entity Claim" as defined by the 2014-2015 D&O Policy in that it makes both a monetary and non-monetary demand.  While

---

*Specialty Ins. Co. v. Pinkmonkey.com Inc.*, 375 F.3d 365, 372-73 (5th Cir. 2004) (analyzing *two separate lawsuits* and whether the claims therein were related); *Brecek v. Young Advisors, Inc. v. Lloyds of London*, 715 F.3d 1231 (10th Cir. 2013) (analyzing multiple legal proceedings and whether the claims therein were related); *Quanta Lines Ins. Co. v. Investors Capital Corp.*, 2009 WL 4884096 *14-15, Case No. 06 Civ 4624 (S.D.N.&. Dec. 17, 2009) (involving a written demand for monetary damages and lawsuit); *Westrec Marina Management, Inc. v. Arrowood Indem. Co.*, 163 Cal.App.4th 1387, 1396 (Cal. App. 2008) (involving an attorney's demand for monetary damages followed by a lawsuit based upon the same facts).  In the instant case, there are not two claims, and the cases cited by Defendant are inapposite.

SDN makes no admission that its act of entering into the AT&T-SDN Agreement in September 2014 was inappropriate or that the Agreement is illegal, execution of the Agreement by SDN was an act. Moreover, based upon NVC's agreement at the Groton meeting in December 2013, SDN, and not NVC, billed AT&T for the transport from Sioux Falls to Groton.  Again, for the sake of argument only, NVC asserted that it had the exclusive right to bill for the transport from SDN's switch in Sioux Falls to the James Valley Parties' exchange in Groton.  Even though it is not a legally sustainable claim, NVC made a claim that SDN's actions resulted in monetary harm to NVC.  SDN gave timely notice of this claim and Twin City Fire had an obligation to provide coverage and a defense.  *See, e.g., Interstate Bakeries Corp. v. OneBeacon Ins. Co.*, 686 F.3d 539, 542 (8th Cir. 2012) (holding:  "If the complaint merely alleges facts that give rise to a claim potentially within the policy's coverage, the insurer has a duty to defend.") (quoting *McCormack Baron Mgmt. Servs., Inc. v. Am. Guar. & Liab. Ins. Co.*, 989 S.W.2d 168, 170-71 (Mo. 1999)); *see also Hawkeye-Security Ins. Co. v. Clifford by Clifford*, 366 N.W.2d 489 (S.D. 1985) (holding:  "[i]t is the general rule that the duty of an insurance company to defend its insured is to be determined by the allegations of the complaint or petition in the action brought against the insured." (quoting *U.S. Fidelity and Guaranty Co. v. Louis A. Roser Co., Inc.*, 585 F.2d 932, 936 (8th Cir. 1978)).

    **C.**    **The 2013 Letter and November 2014 Letter are not interrelated wrongful acts.**

Twin City Fire does not deny that the November 2014 Letter and subsequent lawsuit fall within the applicable definition of the 2014-2015 Policy, but seeks to defeat coverage by invoking the Interrelated Wrongful Acts provisions to establish that the claim actually arose under the 2013-2014 SDN D&O Policy.  In order to invoke the Interrelationship of Claims provision, there must first be a claim made.  As established above, the 2013 Letter was not a

claim.  However, even to the extent that such an argument can be made, Twin City Fire is unable to show that the alleged wrongful acts of which the James Valley Parties complained are interrelated.

Section X of the 2014 Policy defines "Interrelationship of Claims" as follows:

> X.     INTERRELATIONSHIP OF CLAIMS
> Solely with respect to all Liability Coverage Parts:
>
> All Claims based upon, arising from or in any way related to the same Wrongful Act or Interrelated Wrongful Acts shall be deemed to be a single Claim for all purposes under this Policy first made on the earliest date that:
>
> (A) any of such Claims was first made, regardless of whether such date is before or during the Policy Period[.]

*See* Amended Complaint, Exhibit B.  "Wrongful act" is defined in part as "any or actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed by an 'Insured Person' in their capacity as such."  *Id.*  "Interrelated Wrongful Acts" are defined as "'wrongful acts' that have as a common nexus any fact, circumstances, situation, event, transaction, goal, motive, methodology, or cause or series of causally connected facts, circumstances, situations, events, transactions, goals, motives, methodologies or causes."  *Id.*

Even though Twin City Fire attempts to characterize the events of November 2013 and November 2014 as logically connected, that connection is too tenuous to constitute the relationship required under the Policy language.  The 2014-2015 D&O Policy requires a showing of a wrongful act, not a generic statement that could be applied in any context and most certainly not one that cites to a lengthy billing dispute between AT&T and NVC that started before SDN ever even had a conversation with AT&T.  To that end, the common fact cannot be the continued non-payment of bills by AT&T, an act beyond the control of SDN.  It also cannot be the fact that the parties were attempting to find a resolution to non-payment issues caused by NVC.

Here, the wrongful act complained of by the James valley Parties is the AT&T-SDN Agreement, which was entered into in September 2014 after months of negotiations. It is these intervening months of negotiations and their resolution that Twin City Fire ignores in its chronology. Between December 2013 and November 2014, consistent with the agreement reached with NVC in Groton on December 6, 2013, SDN worked with both NVC and AT&T to implement SDN and NVC's agreement. In July 2014, NVC and SDN agreed upon and submitted a joint proposal to AT&T. On September 18, 2014, SDN entered into a written agreement with AT&T. That proposal was for the benefit of both SDN and NVC. It was not until *after* the execution of the AT&T-SDN Agreement that the dispute giving rise to the underlying Lawsuit arose. There was no "wrong" committed by SDN in November 2013 because it had done nothing to interfere with NVC's right to bill pursuant to tariff. When AT&T began withholding payment from NVC in March 2013, it did not cite to anything SDN had done as a basis for withholding. Indeed, AT&T started withholding payment from SDN approximately a month later. AT&T alleged that NVC was not billing for services pursuant to its tariff. AT&T continues to advance that defense in connection NVC's federal court against it today.

The underlying lawsuit, in the James Valley Parties' own words, relates to the legality of the AT&T-SDN Agreement.[10] That supposed illegality underpins each and every claim for

_____

[10] Despite their attempts to characterize their claims as common law state claims for breach of contract, breach of fiduciary duty, or breach of good faith and fair dealing, the James Valley Parties' theories of liability, both for the Managers personally and for SDN, are based entirely on alleged violations of the Communications Act of 1934, as amended. The James Valley Parties' theory of the case can be summed up as follows:

1. The Managers authorized SDN to enter into an agreement with AT&T that violates federal law and FCC precedent.
2. The AT&T-SDN Service Agreement is therefore illegal.
3. Plaintiffs' counsel told SDN's counsel that the AT&T-SDN Service Agreement is illegal and SDN did not immediately terminate the Agreement.
4. SDN unlawfully removed certain minutes of use from the cost study used to support its federal tariff filings.

alleged breach of contract and breach of duty of good faith and fair dealing.  As of November 2013, there was no AT&T-SDN Services Agreement.  No agreement of any kind existed until September 2014.  Given the parties' agreement on a joint solution to their respective billing issues with AT&T, SDN was shocked when it received a cease and desist letter in November 2014 from the James Valley Parties' counsel.  However, through the discovery process of the underlying lawsuit, it has become abundantly clear that it was the James Valley Parties that walked away from the parties' agreement and never informed SDN of the same.  SDN negotiated for and received assurances from AT&T that NVC would be paid its tariffed rates between two of its exchanges, Groton and Redfield.  Based on discovery gained from the underlying case, it appears that neither NVC nor AT&T followed through on their end of the negotiations.

Twin City Fire does not acknowledge the existence and timing and execution of the AT&T-SDN Agreement, most likely wanting to characterize it as another of SDN's schemes to interfere with NVC's ability to bill AT&T pursuant to tariff.  To that end, Twin City Fire makes the bold statement that there is no question but that the 2013 Letter and Lawsuit are both claims and interrelated claims in that "[e]ach are written demands for monetary damages and/or other civil non-monetary relief, i.e., injunctive relief."  *See* Defendant's Memorandum at p. 7.   This argument is circular at best and must be rejected.  Merely because there was commonality in the legal causes of action contained in the draft complaint and the March 2015 Lawsuit does not mean they were predicated upon the same precipitating event.  *See, e.g.*, *Interstate Bakeries*

---

5.  SDN's act of removing the minutes from its cost study and thereafter submitting the resulting study and tariff to the FCC for approval was fraudulent and/or criminal.
6.  SDN's federal tariff discriminates against other telecommunications carriers.
7.  SDN's federal tariff is illegal.

The James Valley Parties even assert that it is their intention to request that the circuit court (1) order SDN to stop this alleged discrimination in offering a rate to AT&T that is different from those offered to other long distance carriers and (2) dissolve SDN because it operates under an illegal tariff.  The state law claims in the 2013 unsigned, draft complaint are based on entirely different facts than those in the 2015 filed complaint.  The James Valley Parties' arguments rest upon a single e-mail, taken out of context, from an FCC Staffer that states that an ILEC, and SDN is not an ILEC, cannot offer a tandem switching service pursuant to contract.

*Corp.*, 686 F.3d at 542 (noting that an insurer cannot "merely rest upon the allegations contained within the [complaint];" it must also "consider 'other facts it knew, or could have learned from a reasonable investigation at the time the lawsuit was filed.'") (quoting *Stark Liquidation Co. v. Florists' Mut. Ins. Co.*, 243 S.W.3d 385, 392 (Mo.Ct.App. 2007) and *Secura Ins. v. Horizon Plumbing, Inc.*, 670 F.3d 857, 861 (8th Cir. 2012))

The case of *Lodgenet Entertainment Corp. v. American Intern. Specialty Lines Ins. Co.*, 299 F.Supp.2d 987 (D.S.D. 2003) is instructive. In that case, Lodgenet Entertainment Corp. ("Lodgenet") had been sued by an employee for sexual harassment, among other related claims. *Lodgenet Entertainment Corp.*, 299 F.Supp.2d at 989. The employee originally filed an administrative charge against Lodgenet with the South Dakota Division of Human Rights; however, that charge was dismissed following a determination of no probable cause and the employee thereafter brought a civil action against Lodgenet. *Id.* Lodgenet did not notify its insurer of the administrative charge, but it did notify its insurer of the lawsuit. A series of communications between Lodgenet and its insurer ensued, with some question as to the timing of the receipt of notice, but irrespective of those issues, the insurer ultimately denied coverage on the basis of untimely notice. *Id.* at 990.

Lodgenet filed suit against its insurer, arguing that the civil lawsuit was a separate claim from the administrative action even though both were premised upon the same set of facts. *Id.* at 992. The policy at issue in the case was a claims-made policy and the reviewing court found an ambiguity in the policy, noting that the definition of "'claim' was intended to encompass all types of proceedings arising out of the same facts." *Id.* The reviewing court then reviewed other portions of the policy to determine whether the policy contemplated that the same set of facts could give rise to multiple claims, concluding that Lodgenet was entitled to coverage for the

20

claim.  Notably, the reviewing court stated that the policy did not require notice of the mere *possibility* of a claim and further that the policy did not preclude coverage for multiple claims that might arise from the same set of facts.  *Id.* at 993.

Lodgenet establishes that (1) the mere possibility of a claim is not a claim and (2) even when there are similar facts, there can still be multiple claims, each deserving of coverage. Under the facts of this case, SDN has given timely notice of a claim that first arose in November 2014.  To that end, it is SDN that should be entitled to an award of summary judgment on the issue of coverage, and not Twin City Fire.

### D. Twin City Fire has not established any prejudice as a result of the alleged untimely notice.

The entirety of Twin City Fire's denial of coverage is predicated upon SDN's alleged lack of timely notice under the terms of the 2013-2014 Policy.  Even if the 2013 Letter constituted an Entity Claim within the meaning of the 2013-2014 D&O Policy, which SDN denies, SDN believes that Twin City Fire must show some sort of prejudice in order to wholly defeat SDN's reasonable expectation of coverage.  This is particularly true because the notice requirements of the 2013-2014 D&O Policy required notice either as soon as practicable or within 60 days of termination of the 2013-2014 Policy.  Given the resolution of the demand made by the James Valley Parties in their 2013 Letter, there was nothing of which to give timely notice to Twin City Fire.[11]  Taking Twin City Fire's argument to its logical or illogical

---

[11] If SDN had forwarded the 2013 Letter to Twin City Fire, either as soon as practicable, or within 60 days of termination of the 2013-2014 Policy, one is left to speculate as to what action Twin City Fire would have taken. Generally speaking, once reported, an agent would determine whether to set aside a certain amount of money in reserve and thereafter work to investigate the claim and mitigate any potential claim for damages.  However, in the instant case, there was no reason to set a reserve nor was there reason to evaluate any claim.  Within days of their 2013 Letter, the James Valley Parties had indicated they would take no legal action against SDN.  Under these circumstances, it seems most likely that Twin City Fire would have asked SDN to make it aware of the filing of a lawsuit or further demand.  However, if said lawsuit or demand had come five years later or 10 years later and been based upon a different set of facts, albeit still related to tariffed billings since that is how these companies bill, it seems absurd to suggest that Twin City Fire would still have found coverage under the 2013-2014 Policy.

conclusion, an insured would be required to give notice of virtually any potential threat in order to insure it is not denied coverage in the future.  It is the desire to militate against such an absurd result that prompted the development of the notice-prejudice rule.

The South Dakota Supreme Court recognized the notice-prejudice rule in *Auto–Owners Ins. Co. v. Hansen Housing, Inc.,* 604 N.W.2d 504, 513 (S.D. 2000). "Where the insurance company's interests have not been harmed by a late notice, even in the absence of extenuating circumstances to excuse the tardiness, ... it follows neither logic nor fairness to relieve the insurance company of its obligation under the policy in such a situation." (internal quotations and citations omitted).  *McElgunn v. Cuna Mut. Ins. Soc.*, 700 F. Supp. 2d 1141, 1156–57 (D.S.D. 2010); *see also Union Pacific R.R. v. Certain Underwriters at Lloyd's London*, 2009 S.D. 70, ¶ 24, 771 N.W.2d 611, 618 (holding: "South Dakota law requires that an insurer show actual prejudice caused by an untimely notice and not just mere allegations of prejudice in order to prevail.").  The purpose of the notice-prejudice rule is to address: (1) the adhesive nature of insurance contracts; (2) public policy objectives of providing insurance to those who regularly and timely pay premiums; and (3) equity considerations that prevent an insurer from receiving a windfall as a result of a technicality in the application of a policy.  *See Alcazar v. Hayes*, 982 S.W.2d 845, 850 (Tenn. 1998). *see also Oakland-Alameda County Coliseum, Inc. v. Nat'l Union Fire Ins. Co.,* 480 F.Supp.2d 1182, 1196 (N.D.Cal. 2007) (applying the 'notice prejudice' rule applies to 'claims-made' policies.").

Typically, the rule has not been applied to claims-made policies because of the argument that its application would undermine the purpose of a claims-made policy by removing the significance of timely notice and an insurer's ability to limit its exposure.  *See Worthington Federal Bank v. Everest National Ins. Co.*, 110 F.Supp.2d 1211 at 1222 (N.D. Ala. 2015)

(explaining development of claims-made policies).  However, there are courts that have extended the notice-prejudice rule to claims-made policies where there is no additional exposure to an insurer and the insured would lose the benefit of its bargain by purchase insurance.  This position reflects the more modern view of notice.  In the case of *City of Ft. Pierre v. United Fire and Casualty Co.*, 463 N.W.2d 845 (S.D. 1990), the South Dakota Supreme Court stated:

> The modern view of notice requirements focuses on the purpose for the requirement [of notice] and realizes that it is not to provide a technical escape hatch to allow the insurance company to deny coverage.  The modern view does not belittle the need for notice to the insurer, but instead puts the notice requirement in its proper perspective.  The clear purpose of the notice provision is to protect the ability of the insurer to prepare a viable defense by preserving its ability to investigate the accident.  In other words, notice requirements are included in insurance contracts to protect the insurance company's interest from being prejudiced.  If delayed notification has no prejudice the insurer's ability to defend a claim, then there is no reason to strictly enforce the notice requirement.

(quoting *Great American Ins. Co. v. C.G. Tate Constr. Co.*, 297 S.E.2d 769. 775 (N.C. 1981)).  This case merits similar analysis.

This case represents an example of where application of the notice-prejudice rule is appropriate.  SDN had coverage with Twin City Fire for ten years.  During that time, it made no claims.  It made no false statements on any of its applications for coverage.  It regularly paid premiums for coverage and insured that coverage never lapsed from year to year.  SDN did everything to insure that it would have coverage in the event a claim was made against it.  *See* Aff. Counsel at Exh. 18.  Despite its actions in continuing its coverage, however, SDN had no negotiating power with regard to the terms of the respective annual policies, as aptly demonstrated by the fact that Twin City Fire changed the definition of "Entity Claim" without ever giving notice of that change to SDN.  As such, to the extent that Twin City Fire seeks to confine SDN to the terms of the 2013-2014 Policy, it must show just why it is entitled to defeat a reasonable expectation of coverage.  Public policy demands something more of an insurer.

When doubt exists as to whether coverage is available, the language should be construed to provide coverage.  *See Hawkeye-Security Ins. Co.*, 366 N.W.2d at 492; *see also Roser Co., Inc.*, 585 F.2d at 936 (establishing that insurer bears burden of proving that there is no duty to defend and that doubt must be resolved in favor of the insured); *Allstate Ins. Co. v. Demps,* 348 N.W.2d 720, 724 (1984) (same); *Jostens, Inc. v. CNA Ins., Continental Cas. Co.,* 336 N.W.2d 544, 545 (Minn.1983) (same); *Inland Const. Corp., supra; F. and M. State Bank v. St. Paul Fire & Marine,* 309 Minn. 14, 242 N.W.2d 840, 842 (Minn.1976) (holding that this insured should receive benefit of a duty to defend prior to any trial in the lawsuit for which coverage is sought). While an insurer has the right to limit the risks that it may be required to indemnify by requiring notice, disallowing coverage in the instant case does nothing to further that goal.  Twin City Fire has not been harmed by the timing of when it was given notice, nor has it demonstrated that any alleged untimely notice resulted in increasing any potential indemnification obligation that Twin City Fire may have.  *Compare with AMCO Insurance Co., v. Employers Mut. Casualty Company*, 2014 S.D. 20, 845 N.W.2d 918.

Twin City Fire has offered no explanation of any prejudice it sustained as a result of not receiving notice of the 2013 Letter.  In fact, there is little or any prejudice that it could show given that the issues raised by the 2013 Letter were resolved inside of a week and the draft complaint was not filed.  There was no action that Twin City Fire could have taken or investigation it could have undertaken that would have somehow altered the defenses asserted by SDN in connection with the James Valley Parties' Lawsuit or any potential liability on the part of SDN.  Twin City Fire instead endeavors to take advantage of a technicality in the contract and the ability to take advantage of a one-sided view of the facts of the underlying Lawsuit.  SDN has been treated as the wrongdoer in this case, both for the purposes of the underlying litigation,

as well as the application of the policy itself.  For these reasons, Twin City Fire's Motion for Summary Judgment should fail.

## III.    Outstanding Discovery Issues Preclude Summary Judgment.

Even if this Court is inclined to consider some of Twi City Fire's arguments, questions about the language of the policies must yet be resolved.  Twin City Fire's high-level arguments about the nature of the 2013 Letter seemingly capitalize on the benefit of a change in policy wording for which SDN has sought, but not received, additional information. By way of example, in its Memorandum, Twin City Fire states:

> There is no question that the JVC Lawsuit, November 2013 Letter, and 2013 are claims.  Each are written demands for monetary damages and/or other civil non-monetary relief, i.e., injunctive relief.
>  . . . .
> The wrongful acts in the JVC Lawsuit are clearly interrelated to the wrongful acts in the November 2013 Letter and the 2013 complaint.  In some cases they are the same wrongful acts.  The acts at issue in the JVC Lawsuit, the November 2013 Letter and the 2013 Complaint all concern a continuing dispute involving SDN allowing AT&T direct access thereby allegedly subverting JVC's rights to collect tariffs from AT&T.

*See* Defendant's Memorandum at pp. 8-9.  As evidenced by the definitions of an "Entity Claim" as contained in both the 2013-2014 D&O Policy and 2014-2015 D&O Policy, a change was made in the wording of Section 2, Subsection D, Subparagraph 2, namely the inclusion of the phrase "civil non-monetary relief" in the 2014-2015 Policy.  The prior version of the policy referenced only "civil relief."  There are facts yet to be discovered that may have a bearing on the ultimate analysis given the arguments advanced by Twin City Fire.  *See* Fed. R. Civ. P. 56(d) (providing that the court may "defer considering the motion [for summary judgment] or deny it," in addition to other action it deems appropriate if it requires additional facts in order to oppose the motion); *see also Ray v. Am. Airlines, Inc.,* 609 F.3d 917, 923 (8th Cir.2010) (holding that Rule 56(d) reflects the principle that "summary judgment is proper only after the nonmovant has

had adequate time for discovery." ); *United States ex. rel. Bernard v. Casino Magic Corp.,* 293 F.3d 419, 426 (8th Cir. 2002) (holding that As such, Rule 56(d) "should be applied with a spirit of liberality."); *Costello, Porter v. Providers Fidelity Life Ins. Co.*, 958 F.2d 836, 839 (8th Cir. 1992).

Twin City Fire's application of the definitions from both Policies presents the consummate "gotcha" argument.  Even assuming for the sake of argument that there is a relationship between the events and that the 2013 Letter ripened into a claim under the language of the Policy, SDN was not required to give notice under the terms of the 2013-2014 policy because the pertinent language in that particular D&O Insurance policy did not specify non-monetary relief as a claim for which notice was required.  The 2013 Letter was a non-monetary demand.  It was not a claim.  If anything, as set forth above, the 2013 notice was a "non-monetary claim" as defined in the policy in effect at that time and, therefore, a claim for which notice was not required.  The 2014 Policy was expanded to include both "monetary and other civil non-monetary relief."  The specific addition and inclusion of the phrase "non-monetary" confirms that under the 2013 Policy, SDN was not required to provide notice of non-monetary claims.  To the extent Twin City fire now asserts otherwise and attempts to use the definition of an Entity Claim as contained in the 2014-2015 D&O to invoke the interrelationship of claims provision, there may well be an ambiguity that must be interpreted against Twin City Fire.  *See, e.g., Economic Aero Club v. Avemco Ins. Co.,* 540 N.W.2d 644, 645 (S.D. 1995) *(*quoting *American Family Mut. Ins. v. Elliot,* 523 N.W.2d 100, 102 (S.D. 1994) (holding: "[a]n insurance policy is ambiguous when it 'is fairly susceptible to two constructions.'"); *Alverson v. Northwestern Nat'l Cas. Co.*, 1997 S.D. 9, ¶ 8, 559 N.W.2d 234, 235 (holding that a policy susceptible to multiple interpretations must be interpreted against the insurer) (citations omitted).

In order to ascertain the significance of the change in the definition of "Entity Claim," and any impact of that change upon the application and interpretation of the interrelationship of claims provision, SDN served discovery upon Twin City Fire in July 2014, seeking, among other things, to establish why the language was changed and whether any explanation was offered to insureds about the change in the definition, as well as any implications of that change on coverage. [12]  Twin City Fire objected to a great many of these requests as irrelevant, providing no response whatsoever.  *See* Rule 56(d) Affidavit at ¶5.

On the same date that it served its Motion for Summary Judgment, Twin City Fire served its responsive pleading, objecting to many of the Requests related to the policy change as "overly broad, vague, unduly burdensome and seeks information which is neither relevant nor likely to

---

[12] Specifically, SDN served the following Interrogatories on Twin City Fire:

> Interrogatory No. 4.        Explain fully why Twin City Fire chose to change the policy of insurance SDN renewed and/or purchased from Twin City Fire for the period of January 2014 through January 2015 to include a requirement that its insured provide notice on "non-monetary claims."

> Interrogatory No. 5.        State why Twin City Fire chose to amend the policy of insurance South Dakota Network renewed and/or purchased from Twin City Fire for the period of January 2014 through January 2015 by eliminating the language on page 1 of 3 of the 2013-2014 policy providing that Notice of Claim must be given in no event later than sixty (60) calendar days after the termination of the policy period and replacing it with:  X(A) on page 10 of 10 of the former policy to now provide that Notice of Claim be given as soon as practicable but in no event later than "(1) if this Policy expires or is otherwise terminated without being renewed with the Insurer, ninety (90) days after the effective date of said expiration or termination."

> Interrogatory No. 6.        Identify whether and by whom any internal analysis was completed regarding the changes referenced in Interrogatory Nos. 4 and 5 above.

> Interrogatory No. 7.        Identify whether an internal underwriting worksheet or any similar memorandum was prepared to support development of the policy language change referenced in Interrogatory Nos. 4 and 5 above.

> Interrogatory No. 8.        At the time that SDN renewed its policy of insurance for the period of January 2014 through January 2015, identify whether any written explanation of changes made to that policy was provided to SDN or its agent, Unitel Insurance Group.

> Interrogatory No. 9.        Does Twin City Fire provide any written or oral guidance to its brokers or agents so they can assist existing and potential insureds in determining the type and scope of coverage they need?

*See* Rule 56(d) Affidavit, Exhibit A.

lead to the discovery of relevant evidence." *See* Rule 56(d) Affidavit, Exhibit A.  Twin City Fire

is not the arbiter of relevancy.   To that end, SDN has submitted an Affidavit indicating that

further discovery may be necessary before any decision can be made on Twin City Fire's Motion

for Summary Judgment.[13]

**IV.   Dismissal of SDN's Bad Faith Claim is Premature.**

SDN believes that there is coverage and a corresponding duty to defend and indemnify.

To that end, it has stated a plausible claim for bad faith against Twin City Fire.  In fact, many of

the facts relied upon to establish that there is coverage available to SDN under the 2014-2015

Policy establish that Twin City Fire either ignored or failed to conduct a reasonable investigation

relating to the facts giving rise to the claim made by SDN in April 2015.  *See* SDN's Statement

of Additional Material Facts at ¶¶ 30-33.  On numerous occasions after Twin City Fire's initial

coverage denial, SDN implored Twin City Fire to reconsider its decision, engaging in numerous

telephone calls with Twin City Fire and also submitting multiple letters and e-mails seeking to

clarify Twin City Fire's understanding of the facts.  *Id.*

SDN provided Twin City Fire with additional correspondence and information directly

contradicting the stated reasons for denial of coverage.  SDN provided facts to establish that the

issues raised in the 2013 Letter were resolved, thereby establishing that the alleged claim never

ripened into an Entity or Insured Person Claim as defined in any of SDN's D&O Policies.  SDN

also attempted to correct Twin City Fire's incorrect belief that SDN had reached some sort of

agreement for the provisioning of services as of November 2013.  SDN further provided

evidence that the claim for which it sought coverage first arose in November 2014, thereby

invoking the coverage provided to it under the 2014-2015 D&O Policy. Finally, SDN established

---

[13] To the extent that the discovery dispute is resolved before final briefing in this matter, and to the extent that additional information is disclosed to SDN, SDN reserves the right to seek permission from this Court to file a sur-reply in further opposition to Twin City Fire's Motion for Summary Judgment.

that it provided timely notice of the claim to Twin City Fire as required by the 90-day notice period of the 2014-2015 D&O Policy.   Twin City Fire made no further investigation, ultimately relying upon its initial conclusion.

As pointed out by Twin City Fire, SDN must show that there is "no reasonable basis to deny coverage and there must be knowledge or a reckless disregard of the absence of a reasonable basis to deny coverage."  Defendant's Memorandum at p. 13 (citing *Swenson v. Auto Owners Inc. Co.*, 831 N.W.2d 402, 412, 2013 S.D. 38, ¶32).  As evidenced above, it is apparent that Twin City Fire was reckless in the handling of this claim, either intentionally refusing to examine facts critically important to understand the issues or casually ignoring those facts, believing that it could rely solely upon the incredibly broad language of the policy at issue. While an insurer may not have an affirmative duty to investigate the facts of any claim, if that insurer acquires knowledge of fact that establish a reasonable possibility of coverage, the duty to defend is triggered.  *See Pennzoil Co. v. U.S. Fidelity and Guaranty Co.*, 50 F.3d 580, 583, (8th Cir. 1995) (holding "if the insurer acquires actual knowledge of additional facts that establish a reasonable possibility of coverage, the duty to defend is triggered, even if the insurer made an appropriate initial decision not to defend."); *see also S&L Indus., Inc. v. American Motorists Ins. Co.*, 607 A.2d 1266, 1271-73 (N.J. 1992); *Fitzpatrick v. American Honda Motor Co.*, 575 N.E.2d 90, 92-95 (N.Y. 1991); *United States Fed. & Guar. Co. v. Louis A. Roser Co.*, 585 F.2d 932, 936 (8th Cir. 1978)).  Twin City Fire was provided with facts that established a reasonable possibility of coverage.  It was required to do more.

Additionally, only preliminary discovery has been conducted at this point and further discovery into the handling of this claim and what consideration, if any, was given to the additional submissions made by SDN will further inform the issue of whether there is sufficient

evidence to proceed with a bad faith claim.  It is therefore premature to dismiss this count at this time.

## V.      SDN's Public Policy Count is legally sustainable.

It is also premature to dismiss SDN's Public Policy Count.  "The conditions and limitations imposed by the insurance company must be consistent with public policy[.]"  *AMCO Ins. Co. v. Employers Mut. Cas. Co.*, 2014 S.D. 20, ¶ 10, 845 N.W.2d 918, 921-22 (quoting *Phen v. Progressive N. Ins. Co.*, 2003 S.D. 133, ¶ 6, 672 N.W.2d 52, 54; *see also* SDCL § 53-9-1). The South Dakota Supreme Court has consistently stated that "[p]ublic policy is that principle of law which holds that no person can lawfully do that which has a tendency to be injurious to the public or against the public good."  *AMCO. Ins. Co.*, 2014 S.D. 20 at ¶ 10, 845 N.W.2d at 921-22 (quoting *Bartron v. Codington Cnty.*, 68 S.D. 309, 322 (S.D. 1942) (additional citations omitted)).  "Public policy safeguards "'that which the community wants' and not 'that which an ideal community ought to want.'"  *Id.*

Ultimately, SDN has an expectation of coverage and seamless coverage in this case. SDN purchased insurance policies from and paid premiums for coverage to Twin City Fire for ten years.  Stated differently, Twin City Fire received ten years of premiums from SDN for seamless coverage.  There was no cancellation of coverage, nor did the insured change insurance carriers. *See Ross v. Royal Globe Ins. Co.*, 612 F.2d 379 (8th Cir. 1980) (holding that a renewal of an insurance policy is treated as an extension and not a new policy).  SDN merely renewed its policy on an annual basis.[14]   Renewal should not create a trap wherein a change in the definitional language suddenly allows the carrier to deny coverage.  *See*, *e.g.*, *Helberg v. Natl.*

---

[14] Ironically, had SDN terminated its policy and selected an option for extended coverage and extended reporting period following termination, SDN likely would have had coverage for the instant claim; however, the fact that it instead renewed its policy and continued to pay premiums results in no coverage in the eyes of Twin City Fire.  *See* Aff. Counsel at Exh. 19.

*Union Fire Ins. Co.*, 657 N.E.2d 832, 834 (Ohio App. 1995).  Renewal of a policy "carrie[s] with it a continuation of coverage."  *Id.*; *see also AIG Domestic Claims, Inc. v. Tussey*, No. 2008-CA-001248-MR, 2010 WL 3603844, at *3–4 (Ky. Ct. App. Sept. 17, 2010).   Under such circumstances, public policy demands that coverage ought to exist unless the claimed failure to timely report a claim prejudiced the insurer.  *See Meierhenry v. Spiegel, Inc.*, 277 N.W.2d 298, 300 (S.D. 1979) (holding "public policy is a principle of law which holds that no person can lawfully do that which has a tendency to be injurious to the public or against the public good.").  Twin City Fire urges this Court to adopt an argument that actually discourages the public from maintaining seamless coverage.   In the instant case, Twin City Fire's argument, if accepted, means that the insured pays its insurer $165,000 of loss free premiums.  *See* Aff. Counsel at Exh. 18.  SDN had a justifiable and reasonable expectation of coverage when it renewed its policy for the 2014-2015 term.

SDN should also not be foreclosed from coverage and defense because of Twin City Fire's superficial review of and deference to the James Valley Parties' version of the facts.  In the instant case, the issue is whether the 2014-2015 D&O Policy's interrelationship claims provision is so broad as to nullify any chance of coverage for SDN.  Twin City Fire views the 2013 Letter, 2014 Letter and 2015 lawsuit as a singular and continuous dispute.  This interpretation of the facts is incorrect.  It would have been a legal impossibility for the James Valley Parties to have obtained any of the relief sought in their demand or draft complaint because SDN never took any action with AT&T.  Because SDN indicated that it would not pursue the course of action stated in its November 25, 2013 letter, there were no ripe claims that the James Valley Parties could have pursued.  Under these circumstances, and as set forth on page 24 above, it is inconsistent with the basic public policy of providing coverage, as well as

SDN's reasonable expectation of coverage, to use the interrelationship of claims language to deny coverage.  The application of policy language as suggested by Twin City Fire clearly results in a forfeiture based upon the facts of this case.  Therefore, summary judgment on this claim should be denied.  At a minimum, further discovery on the issue of the change in policy language is required before any ruling is made as to the viability of SDN's claim for violation of public policy.

## CONCLUSION

Twin City Fire's first duty is to SDN.  The duty to defend is broader than mere recitation of facts convenient to the insured.  Twin City Fire should not sacrifice its insured to the offensive, and sometimes outrageous, allegations made by the James Valley Parties in the underlying litigation, particularly when so many of those allegations have now been disproved through the ongoing discovery process.  Accordingly, SDN respectfully requests that Twin City Fire's Motion for Summary Judgment be denied.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(C), SDN respectfully request oral argument on Twin City Fire's Motion for Summary Judgment.

Dated this 23rd day of November, 2016.

Respectfully submitted,

/s/ Meredith A. Moore
Meredith A. Moore
Ryan J. Taylor
Jonathan A. Heber
Cutler Law Firm, LLP
100 N. Phillips Avenue, 9th Floor
Sioux Falls, SD  57101-1400
Telephone:  (605) 335-4950
Email:  meredithm@cutlerlawfirm.com
ryant@cutlerlawfirm.com
jonathanh@cutlerlawfirm.com

*-and-*

Robert C. Riter, Jr.
Darla Pollman Rogers
Margo D. Northrup
Riter, Rogers, Wattier & Northrup, LLP
319 S. Coteau – PO Box 280
Pierre, SD 57501-0280
Telephone: (605) 224-5825
Email: r.riter@riterlaw.com
    drogers@riterlaw.com
    m.northrup@riterlaw.com
    *Attorneys for Plaintiff*

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that the brief complies with the type-volume limitations of Local Rule 7.1(B)(1) and contains 11,554 words.

/s/ Meredith A. Moore