UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| SOUTH DAKOTA NETWORK, LLC, | 4:16-CV-04031-KES |
| Plaintiff, | |
| vs. | ORDER DENYING IN PART AND GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION TO DEFER CONSIDERATION OF DEFENDANT'S MOTION |
| TWIN CITY FIRE INSURANCE COMPANY CO., | |
| Defendant. | |

Plaintiff, South Dakota Network, LLC (SDN), brought this action against Twin City Fire Insurance Company Co., seeking a declaration that Twin City owes a duty to defend SDN in a lawsuit. In addition, SDN seeks damages for breach of contract, bad faith and vexatious refusal to pay, and violation of public policy. Twin City moves for summary judgment on all of SDN's claims. Docket 21.[1] In response, SDN requests this court to deny Twin City's motion for summary judgment or alternatively, under Fed. R. Civ. P. 56(d), defer

---

[1] Twin City did not expressly move for summary judgment on SDN's claims for breach of contract, bad faith and vexatious refusal to pay, and violation of public policy in its motion for summary judgment. Docket 21. But Twin City did address the bad faith and vexatious refusal to pay and the violation of public policy claims in its Memorandum in Support of its Motion for Summary Judgment. Docket 23. Because these claims are based on the underlying dispute of whether Twin City has the duty to defend SDN, the court will address these claims in the interests of justice.

consideration of Twin City's motion for summary judgment until SDN receives additional facts to oppose the motion. Docket 31. For the reasons that follow, the court denies in part and grants in part Twin City's motion for summary judgment and denies SDN's motion.

## FACTS

Construing the facts in a light most favorable to the non-moving party, SDN, the facts are as follows:

SDN is a limited liability company whose seventeen members are local exchange carriers (LECs) in South Dakota that provide telecommunication services to customers in their respective service territories. Docket 8. To assist its members, SDN operates a tandem switch in Sioux Falls to provide an efficient method for LECS and long-distance companies, referred to as interexchange carriers (IXCs), to exchange long distance telecommunication traffic. When IXCs, like AT&T, transmit calls from one local area to another local area, they pay for delivering, or "terminating", the call under a properly filed and approved tariff or under contractual arrangements.

Twin City is an insurance company that issued insurance policies to SDN that included Directors, Officers and Entity Liability Coverage, effective annually from January 9, 2005 through January 9, 2016. Docket 9 at 3. The first policy at issue in this case was effective from January 9, 2013, through January 9, 2014 (2013-2014 D&O Policy). Docket 22-1 at 30. The second policy at issue here was effective from January 9, 2014, through January 9, 2015 (2014-2015 D&O Policy). Docket 22-1 at 81.

2

Twin City's insurance policies issued to SDN are known as claims made and reported policies. Docket 22-1 at 30. The 2013-2014 D&O Policy provides that:

> [C]overage applies only to a claim first made against the insureds during the policy period . . . [and] notice of a claim must be given to the insurer as soon as practicable after a notice manager becomes aware of such claim, but in no event later than sixty (60) calendar days after the termination of the policy period . . . .

*Id.* The 2014-2015 D&O Policy requires notice no later than ninety (90) days after termination of the policy period. Docket 22-1 at 106.

Under the definitions section of the 2013-2014 D&O Policy, a "claim" includes any (i) insured person claim, (ii) entity claim, or (iii) derivative demand. Docket 22-1 at 45. The sections applicable to this case are the "Entity Claim" and "Insured Person Claim." The 2013-2014 D&O Policy defines both "Entity Claim" and "Insured Person Claim" as any:

> (1) written demand for monetary damages or other civil relief commenced by the receipt of such demand; (2) civil proceeding, including an arbitration or other alternative dispute proceeding, commenced by the service of a complaint, filing of a demand for arbitration, or similar pleading; or (3) criminal proceeding commenced by the return of an indictment, or formal administrative or regulatory proceeding commenced by the filing of a notice of charges, or similar document; against an Insured Entity [or an Insured Person].

Docket 22-1 at 46. Both parties agree that the only clause at issue here is (1). *See* Docket 28 at 13 (stating "[s]ubparts 2 and 3 of the definition of Entity Claim are easily dismissed as inapplicable."); Docket 35 at 4 (stating the question is whether the November 2013 letter and the 2013 complaint fall

within the portion of the "claim" definition of "written demand for monetary damages or other civil relief . . .").

In the 2014-2015 D&O Policy, "Entity Claim" and "Insured Person Claim" are defined as "any: (1) written demand for monetary damages or other civil non-monetary relief commenced by the receipt of such demand . . . ." Docket 22-1 at 99. Sections two and three of "Entity Claim" and "Insured Person Claim" are the same as the 2013-2014 D&O Policy defined above. *Id.*

Both policies define a "Wrongful Act" as an actual or alleged "error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed by an Insured Person in their capacity as such . . . or matter claimed against an Insured Person, solely by reason of their serving in such capacity . . . ." Docket 22-1 at 47-48, 101. The policies also express that "Interrelated Wrongful Act" means "Wrongful Acts that have as a common nexus any fact, circumstance, situation, event, transaction, goal, motive, methodology, or cause or series of causally connected facts, circumstances, situations, events, transactions, goals, motives, methodologies or causes." Docket 22 at 35, 86. Finally, both policies provide that:

> All Claims based upon, arising from or in any way related to the same Wrongful Act or Interrelated Wrongful Acts shall be deemed to be a single Claim for all purposes under this Policy first made on the earliest date that . . . any of such Claims was first made, regardless of whether such date is before or during the Policy Period . . . .

Docket 22-1 at 39-40, 91.

One of SDN's members, James Valley Cooperative Telephone Company (JVCTC), is affiliated with Northern Valley Communications (NVC) (collectively

4

the "James Valley Parties"). NVC engages in access stimulation, or traffic pumping, to leverage its tariffed access services. In this business practice, NVC—which is located in a rural service area with high access rates—sets up service agreements with local third parties that have high-volume customers, such as conference call companies. In the agreements, NVC provides the third parties with more access minutes, but does not reduce its access rates. This gives NVC greater access revenues, which it then shares with the local third parties as compensation. The IXCs, which must pay these tariffed access rates, end up financing NVC's access stimulation services. *See* Docket 28 at 2-3; Docket 29 at 10.

AT&T has refused to pay NVC's access charges in relation to NVC's access stimulation since March 2013. AT&T has also refused to pay SDN for its tandem switching charges since April 2013. Docket 30-3 at 5. SDN and the James Valley Parties then began working together to resolve their billing disputes with AT&T. When these negotiations stalled, SDN's Board of Managers sent a letter to NVC's General Manager, James Groft, on November 25, 2013. Docket 22-3 at 21. In this letter, SDN told NVC that SDN planned to prepare a proposal to settle the dispute with AT&T, and if AT&T agreed to the proposal, SDN would bring it to NVC to review and possibly accept. SDN also told NVC that if NVC rejected the proposal, SDN "is authorized by its board to take whatever legal or other action it deems necessary to require NV[C] to terminate the traffic." Docket 22-3 at 21.

In response to SDN's letter, counsel for the James Valley Parties wrote a letter to SDN on November 27, 2013 (November 2013 letter). Docket 22-1 at 21. Accompanying the letter was an unsigned, unfiled, draft Complaint (2013 draft Complaint) that the James Valley Parties asserted they were prepared to file against SDN if SDN did not change its planned course of action. Docket 22-1 at 7. The November 2013 letter provides, in relevant part:

> The purpose of this letter is to demand that SDN cease and desist with the course of action set forth in your letter and to provide further assurances that it will not engage in the unlawful conduct described therein.
>
> Given the long history of a mutually-beneficial relationship between my clients and SDN, my clients were both surprised and disappointed at the Board's decision to try to impose such a mandate on NVC and on its stated intent to actively work in a manner that is adversarial to NVC's interest in obtaining payment for its tariffed services. Thus, for purposes of ensuring that the Board is aware of the basis for our response, and the cease and desist demand contained herein, I summarize a few of the most pertinent facts:
>
> . . . .
>
> (5) In furtherance of its repeatedly-stated position that members and affiliates must use SDN for exchange of access traffic, SDN's Board of Directors approved, and the members ratified in May of this year, an amendment to the Operating Agreement that expressly requires members and affiliates to utilize SDN for their access traffic, and SDN does not have a unilateral right to modify that requirement;
>
> . . . .
>
> (8) SDN CEO Mark Shlanta stated his intent to reverse or deviate from SDN's policy for the first time only a few weeks ago, essentially demanding that NVC subjugate its rights to provide transport at its tariffed rates in order to reach an agreement with AT&T;
>
> . . . .
>
> (11) Following Mr. Shlanta's recently stated intent to change SDN's position on direct connection and his demand that NVC find a solution to the dispute with AT&T, Mr. Groft agreed to provide further proposals for discussion and to continue efforts to work towards a resolution, a promise that Mr. Groft has fulfilled; and

> (12) In an apparent effort to force NVC's hand, rather than allowing those settlement discussions to continue, the actions set forth in your letter were taken by the Board.

Docket 22-1 at 21-22. The November 2013 letter then stated:

> [T]he series of actions outlined in [SDN's] letter constitute an anticipatory breach of the SDN operating agreement and express and implied contracts with NVC. These actions entitle us to proceed directly to court to stop the unlawful conduct. However, because we believe that the Board's actions were made without full consideration of the ramifications of its actions, we are allowing [SDN] until Monday, December 2, 2013, at 5:00 CT to retract the letter and provide written assurance that SDN will not enter into negotiations with AT&T regarding transport for AT&T traffic to NVC, will not terminate circuit agreements between NVC and SDN, and will not falsely accuse NVC of blocking traffic when such actions would be directly caused by the wrongful and unlawful conduct of SDN, not NVC.

*Id.* at 23. The November 2013 letter then listed several causes of action that SDN's "proposed course of action may also give rise to . . ." in addition to constituting a breach of the operating agreement and contracts. *Id.*

Upon receipt of the November 2013 letter, SDN rescinded its November 25, 2013, letter by a board vote. Docket 30-1 at 2. On December 6, 2013, SDN and the James Valley Parties met and agreed to a resolution of their dispute with AT&T. SDN did not report anything about the November 2013 letter or the 2013 draft Complaint to Twin City within 60 days of the 2013-2014 D&O Policy termination date. Docket 29 at 10.

SDN, the James Valley Parties, and AT&T spent the next several months trying to resolve the parties' past billing disputes and AT&T's prospective concerns about the billing rate for the stimulated traffic. In the spring of 2014, the James Valley Parties indicated to SDN its intention to bring a lawsuit

against AT&T to resolve its historical billing disputes. SDN declined the James Valley Parties' invitation to join in this litigation. Docket 29 at 12. In July 2014, NVC filed a complaint against AT&T in federal court related to its past billing dispute, and AT&T counterclaimed. SDN and the James Valley Parties continued negotiating with AT&T as to the future billing rate during June and July 2014. In early September 2014, SDN told NVC that it was finalizing its agreement with AT&T. NVC did not tell SDN to hold off on signing the agreement. On September 18, 2014, SDN and AT&T executed an agreement establishing the rate for prospective transport costs associated with stimulated traffic.

Then, on November 17, 2014, counsel for NVC sent a cease and desist letter to SDN requesting a copy of the September 2014 agreement between SDN and AT&T. *See* Docket 22-1 at 26. On March 26, 2015, SDN received a letter from counsel for NVC, stating NVC had filed a Complaint against SDN, SDN's CEO, Mark Shlanta, and certain SDN Board members. *See id.* at 4. On April 8, 2015, SDN provided written notice of a Claim to its Insurer, Twin City. Docket 22 at 9.

Twin City denied coverage for SDN and stated it would neither defend nor indemnify SDN for the lawsuit NVC filed against SDN. Docket 30-11 at 2, 30-13 at 2. In its July 1, 2015, letter denying coverage, Twin City confirmed SDN, CEO Shlanta, and the other Members of SDN's Board of Managers named in the NVC lawsuit would qualify as an "Insured" under the policies, and thus each would have the potential for coverage. Docket 30-11 at 6. But Twin City

8

maintained that the November 2013 letter and 2013 draft Complaint that were sent to SDN constituted a "claim" under the 2013-2014 D&O Policy, this "claim" from November 2013 was an "interrelated wrongful act" with a common nexus to the NVC lawsuit filed against SDN on March 26, 2015,[2] and Twin City did not receive notice from SDN of this "claim" until April 8, 2015. *Id.* Thus, Twin City stated such notice was received well beyond the 60 days after the termination of the 2013-2014 D&O Policy, as allowed by the 2013-2014 D&O Policy. *Id.* In other words, Twin City denied coverage because SDN did not provide notice of its "claim" to Twin City by March 10, 2014, which SDN admits it did not do. *Id.*; Docket 29 at 10.

Twin City has continued to deny coverage for SDN under any of the D&O policies. On March 4, 2016, SDN brought this action against Twin City for a declaratory judgment that SDN made a timely and valid demand on Twin City for coverage under its 2014-2015 D&O Policy, and Twin City has a duty to defend and indemnify SDN in its lawsuit with the James Valley Parties. Docket 8 at 9. SDN has also included claims for breach of contract, bad faith and vexatious refusal to pay, and violation of public policy. *Id.* Twin City maintains its position that it does not have a duty to defend or indemnify SDN because

---

[2] Specifically, Twin City's letter stated the underlying lawsuit against SDN "is based upon the Insureds [sic] alleged conduct regarding its agreement with AT&T and such agreement's attendant effect on the Plaintiffs. Accordingly, [this action against SDN] is deemed a single Claim first made on November 27, 2013, the date the Insured received the 2013 Draft Complaint, as the Claims are based upon, arise from and are related to the same Wrongful Act or Interrelated Wrongful Acts. Therefore, the Insuring Agreement of the 2013-2014 Policy is implicated." Docket 30-11 at 6.

the applicable policies do not provide coverage to SDN because SDN failed to give timely notice of the claims against it. Docket 21 at 2.

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] party seeking summary judgment always bears the initial responsibility of . . . demonstrat[ing] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party must inform the court of the basis for its motion and also identify the portion of the record that shows there is no genuine issue in dispute. *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citation omitted).

To avoid summary judgment, "[t]he nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.' " *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005) (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995)). "[T]he mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment . . . . Instead, 'the dispute must be outcome determinative under prevailing law.' " *Get Away Club, Inc. v. Coleman*, 969 F.2d 664, 666 (8th Cir. 1992) (quoting *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989)). On a motion for summary judgment, the facts and inferences drawn from those facts are "viewed in the light most favorable to the party opposing the motion."

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

Under Fed. R. Civ. P. 56(d), the nonmoving party may also request a continuance until the nonmovant has had adequate time for discovery to justify his opposition to the other party's motion for summary judgment. *Toben v. Bridgestone Retail Operations, LLC*, 751 F.3d 888, 894 (8th Cir. 2014) (citations omitted). A party moving for a Rule 56(d) continuance must file an affidavit showing how postponement of ruling on the motion for summary judgment will allow him to elicit more facts in discovery that are "essential" to rebut the summary judgment motion. *Id.* A district court has "wide discretion" in ruling on a Rule 56(d) motion. *Id.* at 895.

## DISCUSSION

## I.    Breach of Contract

When interpreting an insurance policy, the rights and obligations of the parties "are determined by the language of the contract, which must be construed according to the plain meaning of its terms." *W. Nat'l Mut. Ins. Co.*, 887 N.W.2d at 890 (citing *Swenson v. Auto Owners Ins. Co.*, 831 N.W.2d 402, 407 (S.D. 2013)). South Dakota law[3] provides that a liability insurer's duty to defend encompasses "any third party claim asserted against an insured that arguably falls within the policy's coverages." *State Farm Fire & Cas. v. Harbert*,

---

[3] In an action based on diversity of citizenship, a federal court must apply the choice of law principles of the state in which the district court is located. *Allianz Ins. Co. of Can. V. Sanftleben*, 454 F.3d 853, 855 (8th Cir. 2006). After applying South Dakota's choice of law rules, it appears that South Dakota law governs and neither party argues otherwise.

741 N.W.2d 228, 234 (S.D. 2007). The insurer has the burden of demonstrating it has no duty to defend the insured. *Id.* (citing *North Star Mut. Ins. Co. v. Kneen*, 484 N.W.2d 908, 912 (S.D. 1992)). To satisfy this burden, the insurer must show the claim "clearly falls outside of policy coverage." *Id.* (citing *State Farm Mut. Auto. Ins. Co. v. Wertz*, 540 N.W.2d 636, 638 (S.D. 1995)). Any doubt about whether an insured's claim falls within a policy's coverage "must be resolved in favor of the insured." *Id.* (citing *City of Fort Pierre v. United Fire & Cas. Co.*, 463 N.W.2d 845, 847 (S.D. 1990)).

### A.   Whether a Claim Existed under the 2013-2014 D&O Policy

Twin City argues that the notice it received on April 8, 2015, of the underlying lawsuit against SDN is an Interrelated Wrongful Act for claims first made in November 2013, and should be treated as a single claim[4] first made on November 27, 2013, under the 2013-2014 D&O Policy language. Docket 23 at 4. As such, Twin City asserts that SDN was required to provide notice of its claim to Twin City no later than March 10, 2014, which it did not do.

---

[4] In its Memorandum in Support of its Motion for Summary Judgment, Twin City analyzes the November 2013 disagreement as a "claim" under the 2014-2015 D&O Policy language. Docket 23 at 7. Because the 2014-2015 D&O Policy language states a "claim" is deemed to be "made on the earliest date that . . . any of such *'claims'* was first made[,]" the court is of the opinion that the November 2013 disagreement must first be analyzed under the 2013-2014 D&O Policy's definition of a "claim." Notably, the only difference between the two policies' definitions of "claim" is the addition of "other civil *non-monetary* relief" in the 2014-2015 D&O Policy (emphasis added). *See also* Docket 35 at 4 (Twin City stating in its reply brief the "question is whether the November 2013 Letter and 2013 Complaint fall within" the definition of a claim as defined in the 2013-2014 D&O Policy).

In response, SDN argues that the 2013-2014 D&O Policy is not applicable to this case because no claim was made against SDN in November 2013. *See* Docket 28 at 10-11. SDN also alludes to the definition of a "claim" in the 2013-2014 D&O Policy as possibly ambiguous. *See* Docket 28 at 13 (stating "it is unclear what the phrase 'or other civil relief commenced by the receipt of such demand' means.").

The November 2013 letter sent to SDN by counsel for the James Valley Parties demanded that SDN "cease and desist with the course of action set forth in [its] letter and to provide further assurances that it will not engage in the unlawful conduct described therein." Docket 22-1 at 21. Accompanying the letter was an unsigned, unfiled, draft Complaint. *Id.* at 7. In its letter, the James Valley Parties gave SDN until December 2, 2013, to retract its November 25, 2013 letter, and stop its "stated intent" of negotiating directly with AT&T. *Id.* at 23.

On December 2, 2013, SDN's Board of Managers held a special board meeting where the Board voted to retract its letter dated November 25, 2013. Docket 30-1 at 2. And SDN rescinded its "stated intent" of negotiating directly with AT&T. On December 6, 2013, SDN and the James Valley Parties met and resolved their dispute as to how to jointly work with AT&T moving forward. Docket 29 at 2; 30-3 at 42. The 2013 draft Complaint was never filed or served.

As noted by the Eighth Circuit, determining whether a "claim" has been made under a claims-made policy involves "differences of degree." *Berry v. St. Paul Fire & Marine Ins. Co.*, 70 F.3d 981, 983 (8th Cir. 1995). This court finds

that a stated intention to act in a certain way, when that stated intention is quickly, formally rescinded, is a relevant difference of degree. And just as it is important for a court to look at "the full text" of a document when determining if that document is a claim under a claims-made insurance policy, *see id.*, it is important for a court to look at the full picture of a situation when determining if a claim was made during a policy period.

Because SDN rescinded its stated intent and SDN was, or at least believed it was, on good terms with the James Valley Parties moving forward, there was no claim to report to Twin City by March 10, 2014, the final date that SDN could notify Twin City of a claim under the 2013-2014 D&O Policy. At most, the November 2013 documents revealed a disagreement among business associates and a warning about how to move forward in the future, and that disagreement was resolved in a matter of weeks. *See* Docket 23 at 4 (Twin City stating in its memorandum that the James Valley Parties "warned SDN not to interfere with their rights . . . ."). In fact, the November 2013 letter demanded that SDN retract its letter, and this is exactly what SDN subsequently did. So the disagreement was resolved just as the James Valley Parties wanted it to be resolved. Thus, there was no pending "written demand for monetary damages or other civil relief" for Twin City to defend on or by March 10, 2014, the last day a claim could be reported to Twin City under the 2013-2014 D&O Policy.

## B.   Whether the Interrelated Wrongful Act Provision Bars Coverage

Twin City also argues that the 2013 disagreement between SDN and the James Valley Parties and the NVC lawsuit filed against SDN on March 26,

14

2015, are an interrelated wrongful act under the policy language. Docket 23 at 8. Specifically, Twin City maintains that the 2015 lawsuit and the November 2013 documents, which it argues are both "claims," "all concern a continuing dispute involving SDN allowing AT&T direct access . . . ." *Id.*

Twin City cites to several cases where courts have found that claims arising out of common facts or situations are interrelated claims. *See* Docket 23 at 8-9. But the court agrees with SDN that in each of these cases, two "claims" were made against the insureds. *See* Docket 28 at 14-15. In fact, many of the cases involved two separate lawsuits. Thus, the cases Twin City relies on are distinguishable from the facts here, where there was no pending claim under the 2013-2014 D&O policy as established above.

Even if this court were to construe the 2013 disagreement broadly as a "claim," it would not constitute an "interrelated wrongful act" under the policy language with the 2015 lawsuit. The policies exclude coverage for "[a]ll Claims based upon, arising from or in any way related to the same Wrongful Act or Interrelated Wrongful Acts . . . ." Docket 22-1 at 39, 91. The policies define an "Interrelated Wrongful Act" as wrongful acts "that have as a common nexus any fact, circumstance, situation, event, transaction, goal, motive, methodology, or cause or series of causally connected facts, circumstances, situations, events, transactions, goals, motives methodologies or causes." Docket 22-1 at 35, 86. And the policies define "Wrongful Act" as any actual or alleged "error, misstatement, misleading statement, act, omission, neglect, or breach of duty" committed by an Insured Person. Docket 22-1 at 47-48, 101.

15

The court must interpret these policy definitions. The "Wrongful Act" policy provision requires some sort of actual or alleged action on behalf of the insured, whether that means an insured's improper action or failure to act. The "Interrelated Wrongful Act" provision is a policy exclusion because the policies state that any interrelated wrongful acts are deemed to be a single claim that relates back to the first date the claim was made. Docket 22-1 at 39-40, 91. *See also Connect Am. Holdings, LLC v. Arch Ins. Co.*, 174 F. Supp. 3d 894, 901-02 (E.D. Penn. 2016) (framing a similar interrelated wrongful act insurance policy provision that relates back as a policy exclusion). Under South Dakota law, policy exclusions in insurance contracts are strictly construed against the insurer. *Alverson v. Nw. Nat'l Cas. Co.*, 559 N.W.2d 234, 238 (S.D. 1997). Thus, this policy exclusion will be strictly construed against Twin City as the insurer.

In this case, the focal point of the policies' definition of an "Interrelated Wrongful Act" is "common nexus." The policies, however, do not define the meaning of "common nexus." Black's Law Dictionary defines nexus as "[a] connection or link, often a causal one." *Nexus, Black's Law Dictionary* (10th ed. 2014).

Based on this definition, the court finds that a common nexus requires a causal connection or a link between the two "wrongful acts." In other words, there must be two separate actions by the insured that are linked together. It is not enough for the actions to be similar in nature or to have parallel facts. Rather, the two actions must have linked or causally connected facts. *See also*

*Connect Am. Holdings*, 174 F. Supp. 3d at 903 ("The focus of the interrelatedness inquiry is on the acts, not on the parties or the goals.").

Applying this interpretation, the court concludes that the November 2013 disagreement between SDN and the James Valley Parties, which was resolved within weeks, is not an Interrelated Wrongful Act to the 2015 lawsuit filed against SDN. In 2013, SDN and the James Valley Parties worked together to convince AT&T to pay SDN and the James Valley Parties for past charges that AT&T was withholding. They disputed their historical billing charges with AT&T, but these joint negotiations stalled. *See generally* Docket 30-3 at 22-23. The James Valley Parties were then upset with SDN because SDN stated it intended to negotiate directly with AT&T and it would bring a proposal back to the James Valley Parties. After the James Valley Parties objected, SDN formally retracted its stated intent and held a meeting with the James Valley Parties on December 6, 2013. At the meeting, they reached a resolution on how to jointly negotiate with AT&T regarding the historical billing dispute. As a result, the 2013 disagreement was resolved. SDN and the James Valley Parties then spent the next several months in early 2014 jointly negotiating with AT&T. Ultimately, the James Valley Parties filed a federal complaint against AT&T related to its historical billing dispute, which SDN declined to join.

On September 18, 2014, SDN and AT&T executed an agreement about future billing costs. This was the basis of the James Valley Parties' lawsuit filed in state court against SDN on March 26, 2015.

Thus, the 2013 disagreement and the 2015 lawsuit involved two different actions by SDN. The 2013 disagreement stemmed from the historical billing dispute with AT&T, while the 2015 lawsuit related to prospective transport costs. The 2013 disagreement occurred because SDN stated its intention to negotiate with AT&T directly, but then retracted its intention in less than 30 days and before the deadline set by the James Valley Parties. The retraction fully resolved the issues identified in the November 2013 letter. The 2015 lawsuit, on the other hand, arose because of an agreement that SDN and AT&T formally executed after the federal lawsuit between the James Valley Parties and AT&T commenced. While the 2013 disagreement and the 2015 lawsuit involved the same parties, they were not causally linked actions by SDN. And unlike the 2013 disagreement, the James Valley Parties never told SDN to discontinue its negotiations about a future billings rate with AT&T before the SDN-AT&T settlement was reached in September 2014. There is no indication in the record that the 2013 disagreement about past billings caused SDN to execute its agreement with AT&T in September 2014 regarding future billing rates. Thus, Twin City's argument that the 2013 disagreement and the 2015 lawsuit "all concern a continuing dispute involving SDN allowing AT&T direct access . . ." (Docket 23 at 8) is too broad. Twin City has not met its burden of proving that the "Interrelated Wrongful Act" policy exclusion bars coverage. *See N. Star Mut. Ins. v. Korzan*, 873 N.W.2d 57, 65 (S.D. 2015) (stating that the insurer has the burden to prove a policy exclusion applies).

## II.    SDN's Bad Faith Claim

Twin City also argues that because there is no duty to defend or indemnify, SDN's bad faith claim fails as a matter of law. Docket 23 at 12. To establish a claim for bad faith, a plaintiff must prove there is "an absence of a reasonable basis for denial of policy benefits . . . and the knowledge or reckless disregard [of the lack] of a reasonable basis for denial." *Swenson v. Auto Owners Ins. Co.*, 831 N.W.2d 402, 412 (S.D. 2013) (alteration in original) (citing *Dakota, Minn. & E. R.R. Corp. v. Acuity*, 771 N.W.2d 623, 629 (S.D. 2009)). In the first-party context, where the insurer has accepted a premium from the insured to provide coverage, bad faith typically occurs when the insurance company " 'consciously engages in wrongdoing during its processing or paying of policy benefits to its insured.' " *Dakota, Minn. & E. R.R. Corp.*, 771 N.W.2d at 629 (quoting *Hein v. Acuity*, 731 N.W.2d 231, 235 (S.D. 2007)). Bad faith can include an insurer's failure to conduct a reasonable investigation of the insured's claim. *Id.* (internal citation omitted). Whether an insurer has acted in bad faith in its decision to deny coverage is generally a question of fact. *Id.* at 629-30. But if an insured's claim is "fairly debatable" in fact or law, then the insurer has a reasonable basis to deny the claim without acting in bad faith. *Id.* at 630. The insurer's decision to deny coverage "must be reviewed 'at the time it made the decision . . . .' " *Id.* (citing *Walz v. Fireman's Fund. Ins. Co.*, 556 N.W.2d 68, 70 (S.D. 1996)).

SDN ultimately provided written notice of a Claim to Twin City on April 8, 2015. Twin City denied coverage on July 1, 2015, stating it would neither

defend nor indemnify SDN for the lawsuit filed against SDN. Docket 30-11 at 2. SDN then submitted many letters and emails to Twin City, seeking to clarify Twin City's understanding of the facts in the underlying dispute with the James Valley Parties. Because there is evidence that SDN provided Twin City with additional information, there is a question of fact as to whether Twin City conducted a reasonable investigation to reconsider its decision to deny coverage. Twin City is correct in that even an incorrect denial of coverage is insufficient to support a claim for bad faith. *See Mudlin v. Hills Materials Co.*, 742 N.W.2d 49, 54 (S.D. 2007). But whether Twin City had a reasonable basis to deny SDN's claim must be reviewed by the finder of fact based on evidence existing at the time it denied coverage to SDN.

In its bad faith claim, SDN also alleges Twin City's refusal to provide coverage was vexatious, entitling SDN to recover attorney's fees and other costs. Docket 8 at 11. Twin City briefly addressed this claim in its Memorandum in Support of its Motion for Summary Judgment. Docket 23 at 14. Ruling on this issue is premature at this time. *See Bjornestad v. Progressive N. Ins. Co.*, 664 F.3d 1195, 1198-1200 (8th Cir. 2011) (reviewing the application of South Dakota law to a district court's award of attorney's fees for vexatious and unreasonable conduct, a fact-driven question, after a jury verdict was rendered in the case).

### III.   SDN's Public Policy Claim

Finally, Twin City argues that SDN's public policy claim must fail as a matter of law because SDN "cannot meet its high burden to establish that any

Twin City policy provision violates public policy." Docket 23 at 14. In its Amended Complaint, SDN states that Twin City's "broad interpretation" of the "interrelated acts" policy provision in the claims-made insurance policies is inconsistent with South Dakota public policy. Docket 8 at 11-12. In other words, SDN claims it violates public policy to treat the events of November 2013 and the subsequent lawsuit filed in 2015 as an "interrelated claim" as defined in the policies. Twin City argues that there is no statute or court decision that prohibits such interrelated claim provisions as a matter of South Dakota public policy. Docket 23 at 14. In response, SDN argues it is premature to dismiss its public policy count. Docket 28 at 30.

Conditions and limitations imposed by insurance policies must be consistent with public policy. *AMCO Ins. Co. v. Emp'rs Mut. Cas. Co.*, 845 N.W.2d 918, 921 (S.D. 2014). An insurance policy provision that is "prohibited by statute, condemned by judicial decision, [or] contrary to any identifiable public morals" violates public policy. *Id.* at 923 (quotation omitted).

South Dakota law does not prohibit "a commercial general liability insurer from excluding coverage for an unknown continuous or progressive loss that occurs before the inception date of the policy." *AMCO*, 845 N.W.2d at 922. And "[c]ommercial general liability insurance contracts commonly limit the risks the insurer intends to indemnify." *Id.* at 923. Thus, South Dakota public policy generally accepts the use of insurance policy exclusions.

The "Interrelated Wrongful Act" provision here is a policy exclusion in this claims-made insurance policy. SDN has not directed the court to any

21

South Dakota statute, judicial decision, or public moral prohibiting the use of an "Interrelated Wrongful Act" policy provision, and the court has not found one. While the court has not accepted Twin City's interpretation of the "Interrelated Wrongful Act" provision based on the facts of this case, the use of an interrelated claim insurance policy provision does not violate South Dakota public policy. Thus, Twin City is entitled to summary judgment on SDN's claim for a violation of public policy.

## CONCLUSION

The court finds that, as a matter of law, there was no pending "claim" during the 2013-2014 D&O Policy and further finds that the 2013 disagreement and the 2015 lawsuit are not an "Interrelated Wrongful Act" under the policies' definition so as to bar coverage to SDN. On SDN's bad faith claim, the court finds that whether Twin City denied coverage to SDN on a reasonable basis presents a question of fact for the jury. Finally, the court concludes that the use of an "Interrelated Wrongful Act" policy provision does not violate South Dakota public policy. Thus, it is

ORDERED that Twin City's Motion for Summary Judgment (Docket 21) is denied on the issue of SDN's claim for a declaratory judgment and breach of contract, denied on the issue of SDN's claim for bad faith, and granted on the issue of SDN's claim for a violation of public policy.

IT IS FURTHER ORDERED that SDN's motion to delay ruling on Twin City's Motion for Summary Judgment under Fed. R. Civ. P. 56(d) (Docket 31) is denied as moot.

DATED this 22nd day of September, 2017.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE